ACCEPTED
12-15-00105-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
9/11/2015 4:59:39 PM
Pam Estes
CLERK

# No. 12-15-00105-CV

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
9/11/2015 4:59:39 PM
PAM ESTES
Clerk

## In the Twelfth Court of Appeals
## Tyler, Texas

**Consolidated Property Interests, LLC,**
*Appellant*

**v.**

**Jerry Payne and Penny Payne,**
*Appellees*

---

*Appealed from the 273rd Judicial District Court*
*Sabine County, Texas*

---

## APPELLANT'S BRIEF

---

BRENT L. WATKINS
Texas Bar No. 24033312
SKELTON SLUSHER
1616 S. Chestnut
Lufkin, Texas 75902
Telephone: 936-632-2300
Facsimile: 936-632-6545
bwatkins@skeltonslusher.com

GREG SMITH
Texas Bar No. 18600600
RAMEY & FLOCK, P.C.
100 E. Ferguson, Suite 500
Tyler, Texas 75702
Telephone: 903-597-3301
Facsimile: 903-597-2413
gsmith@rameyflock.com

**ATTORNEYS FOR APPELLANT**

***ORAL ARGUMENT REQUESTED***

**The Parties and Their Counsel**

**I.      Appellant:**

Consolidated Property Interests, LLC

**II.     Counsel for Appellant:**

Gregory D. Smith  (*lead counsel on appeal*)
Nolan Smith
RAMEY & FLOCK, P.C.
100 E. Ferguson, Suite 500
Tyler, TX 75702
Telephone: 903-597-3301
Facsimile:  903-597-2413
gregs@rameyflock.com
nolans@rameyflock.com

Brent L. Watkins   (*trial counsel and appellate co-counsel*)
SKELTON SLUSHER
1616 S. Chestnut
Lufkin, TX 75902
Telephone: 936-632-2300
Facsimile:  936-632-6545
bwatkins@skeltonslusher.com

**III.    Appellees:**

Jerry Payne
Penny Payne

**IV.     Counsel for Appellees**:

John H. Seale
P. O. Box 480
Jasper, TX 75951
Telephone: 409-384-3463
Facsimile:  409-384-3017
katiecmorgan@yahoo.com

**V.      Other Parties Below:**    *(Cross-defendants at trial)*

Consolidated Oil & Gas, LLC
Edna Beatrice Casey
Debra Lynn Casey Berry
Chirstopher Eric Casey
Rachelle W. Casey

**VI.     Counsel for Other Parties Below:**

Brent L. Watkins
SKELTON SLUSHER
1616 S. Chestnut
Lufkin, TX 75902
Telephone: 936-632-2300
Facsimile:  936-632-6545
bwatkins@skeltonslusher.com

/s/ Gregory D. Smith
GREGORY D. SMITH

# Contents

Identity of Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement Regarding Oral Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

I.    The trial court erred in its determination of mineral
      ownership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      A.  The trial court has invoked one of two insupportable
          conclusions: (i) that the 1907 deed did not grant a community
          interest or (ii) that the 1931 mineral deed was ineffectual  . . . . . 10

          1.  The 1907 deed gave Pearl Payne a community one-half
              mineral interest, which her children later inherited . . . . . . . 10

              a.  The 1904 and 1907 deeds do not reflect a loan
                  but were ordinary, fee-simple conveyances . . . . . . . . . 11

                  i.   Penny's contrary loan theory belongs on
                       the trash heap of idle speculation  . . . . . . . . . . . . 11

                  ii.  The misguided loan theory
                       focuses on immaterial matters  . . . . . . . . . . . . . . . 11

                  iii. Worst of all, the loan theory contradicts the
                       controlling terms of *three* legal instruments . . . . . 13

b. The subject land was Pearl and J. O. Payne's community property .......................... 18

    i. Property acquired during marriage is presumed community property (and, absent proper tracing, this presumption is conclusive) .............. 19

    ii. The subject property was as a matter of law community property ..................... 20

    iii. Payne family members, through multiple transactions, recognized the property as community property ...................... 25

2. The 1931 mineral deed granted Frances and James Jr. a half mineral interest in the subject property ........... 28

B. Taken together, the 1907 and 1931 deeds conclusively negate Penny's position on mineral ownership and confirm Consolidated's right to judgment ................. 36

II. Consolidated is entitled to recover declaratory-judgment attorneys' fees .......................................... 40

Conclusion and Prayer ......................................... 41

Certificate of Service ......................................... 43

Certificate of Compliance ...................................... 43

Appendices:
    A. *Judgment*
    B. *1904 Deed (J. O. Payne to W. A. Polley)*
    C. *1906 Release*
    D. *1907 Deed (W. A. Polley to J. O. Payne)*
    E. *Consolidated's Request for Findings and Conclusions*
    F. *Certificate of Mailing*

# Authorities

**Cases:**

*Blakely v. Kanaman*, 175 S.W. 674 (Tex. 1915) . . . . . . . . . . . . . . . . . . . . . . 4, 28

*Boyd v. Boyd*, 131 S.W.3d 605 (Tex. App.-Fort Worth
2004, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Cherokee Water Co. v. Forderhause*, 641 S.W.2d 522 (Tex. 1982) . . . . . . . . . . . 12

*Clark v. Widsom*, 403 S.W.2d 877 (Tex. Civ. App.-
Corpus Christi 1966, writ ref'd n.r.e.) . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Coker v. Roberts*, 9 S.W. 665 (Tex. 1888) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Colden v. Alexander*, 171 S.W.2d 328 (Tex. 1943) . . . . . . . . . . . . . . . . . . . . . 26

*Davis v. Davis*, 175 S.W.2d 226 (Tex. 1943) . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Faram v. Geritz-Faram*, 895 S.W.2d 839 (Tex. App.-
Fort Worth 1995, no writ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Hammett v. Farrar,* 29 S.W.2d 949
(Tex. Comm. App. 1930) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Hurley v. Tarrant County*, 232 S.W.3d 781 (Tex. App.-
Fort Worth 2007, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Irvin v. Parker*, 139 S.W.3d 703 (Tex. App.-Fort Worth
2004, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

*Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150
(Tex. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Kachina Pipeline Co., Inc. v. Lillis*, ___ S.W.3d ___,
2015 WL 3653272 (Tex. June 12, 2015) . . . . . . . . . . . . . . . . . . . . . . . 40

*Kunkel v. Kunkel*, 515 S.W.2d 941 (Tex. App-Amarillo 1974,
    writ ref'd n.r.e.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Lockhart v. Garner*, 298 S.W.2d 108 (Tex. 1957) . . . . . . . . . . . . . . . . . . . . . 19

*Lozano v. Lozano*, 52 S.W.3d 141 (Tex. 2001) . . . . . . . . . . . . . . . . . . . . . 11, 12

*Luckel v. White*, 819 S.W.2d 459 (Tex. 1991) . . . . . . . . . . . . . . . . . . . . . 13, 17

*McKinley v. McKinley*, 496 S.W.2d 540 (Tex. 1973) . . . . . . . . . . . . . . . . . . . . . 19

*Mendoza v. Fid. & Guar. Ins. Underwriters, Inc.*,
    606 S.W.2d 692 (Tex. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Newland v. Newland*, 529 S.W.2d 105 (Tex. Civ. App.-
    Fort Worth 1975, writ denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Parker v. Coop*, 60 Tex. 111 (Tex. 1883) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Patek v. Duncan*, 178 S.W.2d 577 (Tex. Civ. App.-
    Galveston 1944, writ ref'd) . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 34-35

*Pearson v. Fillingim*, 332 S.W.3d 361 (Tex. 2011) . . . . . . . . . . . . . . . . . . . . . . 20

*Richardson v. Hart*, 185 S.W.2d 563 (Tex. 1945) . . . . . . . . . . . . . . . . . . . . . 32-34

*Richardson v. Richardson*, 424 S.W.3d 691 (Tex. App.-
    El Paso 2014, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Roberts v. Roberts*, 999 S.W.2d 424 (Tex. App.-
    El Paso 1999, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Roberts v. Roberts,* 402 S.W.3d 833 (Tex. App.-
    San Antonio, 2013, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Robles v. Robles*, 965 S.W.2d 605 (Tex. App.-Houston
    [1st Dist.] 1998, pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*SAS Institute, Inc. v. Breitenfeld*, 167 S.W.3d 840 (Tex. 2005) . . . . . . . . . . . . . 13

*SAVA gumarska in Kemijska industria d.d. v. Advanced Polymer Sciences, Inc.*, 128 S.W.3d 304 (Tex. App.-Dallas 2004, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Smith v. Buss*, 144 S.W.2d 529 (Tex. 1940) . . . . . . . . . . . . . . . . . . . . . 26

*State Farm Lloyds v. C.M.W.*, 53 S.W.3d 877 (Tex. App.-Dallas 2001, pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Templeton v. Dreiss*, 961 S.W.2d 645 (Tex. App.-San Antonio 1998, pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Welder v. Lamber*, 44 S.W. 281 (Tex. 1898) . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Wilson v. Beck*, 286 S.W. 315 (Tex. Civ. App.-Dallas 1926, writ ref'd) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Woods v. Sims*, 273 S.W.2d 617 (Tex. 1954) . . . . . . . . . . . . . . . . . . . . . . 13, 32

*XTO Energy Inc. v. Nikolai*, 357 S.W.3d 47 (Tex. App.-Fort Worth 2011, pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Zagorski v. Zagorski*, 116 S.W.3d 309 (Tex. App.-Houston [14th Dist.] 2003, pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . 20

### RULES, STATUTES AND OTHER AUTHORITIES:

BLACK'S LAW DICTIONARY, 8th Ed. (2005) . . . . . . . . . . . . . . . . . . . . . . . . . 15

Bruce M. Kramer, "*The Sisyphean Task of Interpreting Mineral Deeds and Leases: An Encyclopedia of Canons of Construction,*" 24 TX. TECH L. REV. 1 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Frank Elliott, *The Fractional Mineral Deed "Subject To" A Lease*, 36 TEX. L. REV. 620 (May 1958) . . . . . . . . . . . . . . . . . . . . . . . . . 31, 34

TEX. CIV. PRAC. & REM. CODE § 37.009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

TEX. FAM. CODE ANN. § 3.003(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

TEX. FAM. CODE ANN. § 101.007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

TEX. PROBATE CODE ANN. § 45 (repealed 1993) . . . . . . . . . . . . . . . . . . . . . . 4

TEX. REV. CIV. STAT. ANN. art. 1299 (repealed 1963) . . . . . . . . . . . . . . . . . . . 4

## The Case

Consolidated Property Interests, LLC, a successor in interest of Frances Payne Casey, brought this declaratory-judgment action, to settle a mineral-interest ownership dispute between two branches of the Payne family: Frances Payne Casey's successors (including Consolidated) and the successors of Frances's step-mother, Gertrude Payne. Consolidated sought a singular declaration on the controlling question – whether back in 1907 the subject land – about 620 acres comprising two Sabine County tracts – had been acquired as the community property of J. O. Payne and J. O.'s first wife, Pearl (Frances's mother). CR 4-9.

Jerry Payne (Gertrude's son and successor) and Jerry's wife, Penny Payne, answered, CR 72-74, counterclaimed against Consolidated, and pled a trespass-to-try-title action against all the successors in interest of Frances Payne Casey. Initially, Jerry and Penny simply argued that the land had been acquired in 1907 as J. O. Payne's separate property. Later, they added a creative attack on the 1931 mineral deed by which J.O. Payne and Gertrude (J. O.'s second wife and Jerry Payne's mother), had granted a half mineral interest to Pearl's children, Frances (Frances Payne Casey) and James Payne Jr. CR 76. They (Penny and Jerry) sought ownership of half the subject land's minerals. CR 75-78.

1

Jerry Payne died before trial. CR 70-71. Penny, his executrix and beneficiary, stepped into his shoes.

Judge Charles R. Mitchell of the 273rd District Court, Sabine County, entered judgment for Jerry and Penny and against Consolidated and the other Frances Payne Casey successors. CR 238-41 (Appendix A). An amended judgment decrees that Penny owns a half mineral interest in both subject tracts, CR 240-41, even though Penny's pleadings only concerned one such tract. *E.g.*, CR 34-42. The judgment also denies that Consolidated and the other successors of Frances Payne Casey maintain any mineral ownership at all in the subject property, CR 241, even though Consolidated indisputably owns other fractional mineral interests, carved from an interest this suit has never put in issue. *See* our Chain-of-Title Flow Chart, *infra*.

Judge Mitchell appears to have based his ruling on Penny's challenge to the 1931 mineral deed. CR 241. But this remains uncertain, because the trial court signed no findings of fact or conclusions of law. Consolidated attempted to request them. Appendix E. But its timely-mailed request didn't arrive at the courthouse within the ten days allotted in the mailbox rule. Appendix F. So the request was ineffectual.

## The Facts

In 1904, J. O. Payne, then a single man, sold W. A. Polley 2,370 acres of land (including the roughly 620 acres at issue here[1]). PX 1; 2 RR 16-17, 76. The transaction was effected through a recorded warranty deed stating that J. O. Payne "granted, sold and conveyed" the lands to Polley, for $11,850 "paid and secured to be paid" by Polley to Payne. PX 1 (**Appendix B**). The deed also said that Payne retained a vendor's lien against the property, and it committed Payne to defend the conveyance against opposing claimants. *Id.*

The following year (1905), J. O. Payne married Pearl Leak. PX 2; 2 RR 13. Then, the next year (1906), J. O. Payne released his vendor's lien on the property. PX 3 (**Appendix C**). The recorded release acknowledged that the 1904 deed "did . . . convey unto W. A. Polley" the lands it described. *Id..* The release also pronounced Payne's quitclaim of any further rights in the property. *Id.*

In 1907, during marriage, J. O. Payne bought back some of the previously sold properties, including both subject-property tracts. PX 4 (**Appendix D**); 2 RR 14-16, 76.

Pearl Payne died in 1909, intestate, 2 RR 65, 138, having birthed two

---

[1]The subject acreage comprises two tracts, which the judgment references as containing 492.02 acres and 127.58 acres, respectively. CR 240.

3

children, Frances and James Jr.[2], 2 RR 25-26, who under then effective law[3] succeeded to Pearl's community-property interests. 2 RR 34, 36.

In 1915, J. O. Payne married his second wife, Gertrude Moss. PX 6; 2 RR 23. The couple had five children together, including Jerry Payne, an original defendant in this suit. 2 RR 146-47. During this marriage, in 1916, J.O. Payne deeded Gertrude a one-half interest in the subject land (surface and minerals). PX7. The deed indicated this was J. O. Payne's entire interest, stating that he was transferring *all* of "that certain tract or parcel of land being a one-half interest." PX 7; 2 RR 65.

Fifteen years later, in 1931, J. O. Payne and Gertrude entered a 10-year mineral lease governing the subject property. PX 8.[4] A month after signing the

---

[2] After J. O. Payne's 1936 death, James Jr. changed his name from James O. Payne Jr. to James Payne Bridges. RR 49, 145. He probably did this because, after Pearl died in his infancy, he was raised by the Bridges family. 2 RR 125.

[3]The rule for intestate succession of community property, as of 1909 and as later codified, provided:
> "Upon the dissolution of the marriage relation by death, all property belonging to the community estate of the husband and wife shall go to the survivor, if there be no child or children of the deceased or their descendants; but if there be a child or children of the deceased, or descendants of such child or children, then the survivor shall be entitled to one half of said property, and the other half shall pass to such child or children, or their descendants. . . ."
> TEX. PROBATE CODE ANN. §45 (repealed Sept. 1, 1993).

[4] J.O. Payne's name appears on the 1931 lease and the subsequent 1931 deed, even though he didn't own an interest in the property, because at the time a married woman's conveyance of an interest in real property was invalid if her husband did not join in the conveyance. TEX. REV. CIV. STAT. ANN. art. 1299 (repealed 1963); *Blakely v. Kanaman*, 175 S.W. 674, 675 (Tex. 1915).

lease and collecting any lease bonus, J. O. Payne and Gertrude signed a warranty mineral deed in favor of Pearl's children (*i.e.*, Frances and James Jr.). PX 9; 2 RR 66. Memorializing a true conveyance, this deed "granted, sold, conveyed . . . an undivided ½ interest in and to all of the oil, gas and other minerals in and under, and that may be produced from" the subject property. PX 9. It further committed J. O. Payne and Gertrude to "warrant and forever defend" the conveyance against any opposing claims. *Id.*

J.O. Payne died, in 1936. PX 11; 2 RR 41-42. Since his death, there have been many transactions touching ownership in the subject lands. Five are in respects material here:

**(i) A 1938 mineral lease:** In 1938, Frances and James Jr. each leased a one-quarter mineral interest to W.A. Bridges. PX 10. (The other one-half mineral interest was still under the 1931 10-year lease.)

**(ii) A 1945 timber deed:** In this instrument, Gertrude, Frances, and James Jr. conveyed the subject property's timber. PX 12; 2 RR 69.

**(iii) A 1948 sale of a surface interest:** In 1948, Frances sold a one-quarter surface interest to James Jr. (whom the deed referenced as James Payne Bridges, *see* note 2, *supra*). PX 13; 2 RR 70.

**(iv) A 1952 multi-party deed:** In this transaction, several parties

5

including James Jr. sold certain real-property interests to Southland Paper Mills. PX 15. The deed listed James Jr.'s interest in the subject land (identified as "Tract 95"), RR 48-49, as "an undivided one-half interest in 620.6 acres[5] (mineral acres and surface acres)." PX 15.

**(v) A 1960 partition deed:** Gertrude and her children, including Jerry Payne, RR 50, entered this partition deed with Southland Paper Mills. PX 16. It expressly ratifies the ownerships stated in the 1952 deed. 2 RR 51.

## Statement Regarding Oral Argument

The record in this case is concise, comprising a one-volume clerk's record and a single volume of trial testimony. Nothing about the case suggests that it could make new law. Rather, by simply applying settled law to undisputed facts, the controlling issues – (i) Penny's failure to trace the 1907 purchase-money consideration and (ii) the 1931 deed's incontestible grant of a full half mineral interest to Frances and James Jr. – fall decisively in Consolidated's favor.

Normally, such a case might not warrant oral argument. Nonetheless, this particular case requires a working understanding of a cumbersome, hundred-year

---

[5] In the immediately following paragraph, this deed states "309.8 acres (Surface Acres) and 309.8 acres (Mineral Acres), same being an undivided one-half interest in 620.6 acres." It appears that the drafter incorrectly calculated 309.8 plus 309.8 as equaling 620.6 rather than 619.6. In later transactions and in the judgment, the subject property is accurately described as totaling 619.6 acres. *E.g.*, PX 16. CR 240 (two tracts: 492.02 acres and 127.58 acres.

6

chain of title. *See* Chain-of-Title Flow Chart, infra §I(D). Given the complexity of this title chain, Consolidated considers it prudent to request oral argument.

**Summary of Argument**

The trial court's determination that Penny Payne owns a half mineral interest is all wrong. Penny urged two bases for her position, neither of them even arguable. On the one hand, she argued that her late husband's father, when acquiring fee simple title to the subject property, had acquired it as his separate property, even though he was married at the time. Penny ultimately admitted the error of this theory. In its place, Penny alternatively, and quite desperately, argued that the standard-form mineral deed by which her mother in law (Gertrude Payne) had granted Frances Payne Casey and James Payne, Jr. a half mineral interest was ineffective. According to Penny, a standard deed proviso – the deed's lease termination clause – somehow countermanded the deed's straightforward granting clause (never mind that this has never been the case in any of the other thousands of deeds containing the same mix of clauses).

Even if Penny had not judicially admitted her separate-property contention out of the case at trial, the argument clearly fell flat: Since the property was acquired during J. O. Payne's marriage to his first wife, Pearl, it would be community property as a matter of law unless Penny could trace it to

7

separate-property funds, with clear and convincing proof. She attempted no such showing. She instead claimed that the 1900s transactions, in which J. O. Payne first sold a large acreage then three years later repurchased a small portion of that acreage, had been a mere loan. But the position was not supported by any shred of proof and, in any event, ran headlong into the clear (and thus controlling) objective intention expressed in the deeds' unambiguous terms. As for the 1931 mineral deed, established rules of construction require that this straightforward, standard-form instrument be construed to convey a half mineral interest to Frances and James Jr.

Frances Payne Casey acquired one quarter interest by inheritance and a second, like interest by deed from Gertrude. This, taken with subsequent, unchallenged conveyances in the mineral interest's chain of title (*see* our Chain-of-Title Flow Chart, § I(D) *infra*), conclusively proves the claims of Consolidated and Frances's other successors and establishes the impropriety of judgment in Penny's favor.

This Court should (a) grant Consolidated the declaratory judgment it sought a decree that the subject property was bought in 1907 as community property), grant Consolidated recovery of its declaratory-judgment attorneys' fees, and (c) order that Penny take nothing on her claims.

## Argument

## I. The trial court erred in determining mineral ownership.

Consolidated and Penny Payne make overlapping claims to some of the same mineral interests. Penny variously rested her claim on two inconsistent theories. On the one hand, Penny initially conceded that the 1931 deed gave Frances and James Jr. a half mineral interest, but she claimed they never inherited the other half mineral interest because, she argued, Pearl Payne had not acquired any community-property interest for Frances and James Jr. to inherit.[6] Alternatively, Penny later added an opposing position, conceding that Frances and James Jr. had in fact inherited a half mineral interest but then arguing that the 1931 warranty mineral deed did not convey them any additional mineral interest but merely "reaffirmed" the inherited interests. 2 RR 32, 34 (" . . . it was their half interest they inherited.").[7] The trial court has granted Penny's relief, determining that, after the 1931 mineral deed, Frances and James Jr. each owned *only* a quarter mineral interest, rather than the half interest each would have owned if they had both inherited Pearl's community half interest and in 1931

---

[6] At trial, Penny seems to have conceded Consolidated's position on the characterization of the 1907 purchase. 2 RR 26, 34, 36; discussed *infra* § I(B)(2)(c) .

[7] Penny added her alternative theory in her first amended answer. CR 72-73. Prior to that pleading, Penny had admitted that the 1931 deed conveyed a ½ interest in the minerals to James Jr. and Frances. CR 35 (first amended counterclaim and cross-action). Discussed *infra* § I(C).

been deeded the remaining half interest by Gertrude. CR 240-41.[8]

**A.     The trial court has invoked one of two legally insupportable conclusions: (i) that the 1907 deed during marriage did not grant Pearl Payne a community-property interest or (ii) that the 1931 mineral deed was ineffectual to convey anything.**

While the trial court appears to have based its adverse decision on Penny's challenge to the 1931 deed as a conveyance, the fact is that *neither* of Penny's alternative arguments will support the trial court's judgment.

**1.     The 1907 deed gave Pearl Payne a community one-half mineral interest, which her children later inherited.**

Penny attacked the 1907 deed frontally and from the flank: (i) alleging that a prior deed (in 1904 from J. O. Payne to W.A. Polley) was really a mortgage while the 1907 deed was merely a release of that mortgage; and (ii) alternatively suggesting that if the subject property was purchased, it was bought as J. O. Payne's separate property. CR 72, 76, 85. Both attacks fail as a matter of law.

---

[8] "The court finds that after the execution of the instrument dated March 12, 1931 . . . and considering the recitals in such instrument, that [James Jr. and Frances] were the owners of 1/4 of the minerals each . . ." CR 240-41.

### a. The 1904 and 1907 deeds do not reflect a loan but were ordinary, fee-simple sales.

#### i. Penny's contrary loan theory belongs on the trash heap of idle speculation.

Penny claims J. O. Payne in 1904 needed money to build his fiancee Pearl a house, so he borrowed the funds from W. A. Polley, putting up his land as collateral via the 1904 deed from Payne to Polley. CR 85, 2 RR 18. But, aside from the immaterial fact that J. O. and Pearl appear to have built a house – during the marriage on a lot bought by Pearl, 2 RR 78 – there is no evidence even hinting at this.[9] It is surmise, through and through, which of course is no evidence. *Hurley v. Tarrant County*, 232 S.W.3d 781, 787 (Tex. App.-Fort Worth 2007, no pet.), citing *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 164 (Tex. 2004).

#### ii. The misguided loan theory focuses on immaterial matters.

Penny's attack focuses upon J. O. Payne's liquidity and the parties' subjectively held beliefs about their unambiguously papered transactions.

---

[9]Because the couple's construction of a house, during the marriage, is entirely consistent with a fee-simple sale in 1904 to Polley and a 1907 fee-simple sale back to the Payne community, it is no evidence of Penny's loan theory. *See, e.g., Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001) (evidence that does not tend to make the existence or non-existence of a material fact more or less probable is in law no evidence of the fact).

Neither of these matters is material.

**J. O. Payne's liquidity.** No amount of proof about J. O. Payne's liquidity, whatever it may have been, could discredit the clear recorded deeds in this case. It is not the least unusual to sell land to raise liquidity or to earmark a sale's proceeds for improvements to other property. It happens all the time. J. O. Payne's alleged need of cash thus is a road to nowhere, equally consistent with the sales that the deeds memorialize as with any speculative loan theory. *See, e.g., Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001) (when circumstances are consistent with two competing versions of the facts and nothing shows that one is more probable than the other, neither fact can be inferred).

**Subjective intention to make a loan.** Even if the parties had subjectively intended a loan, and even if Penny could have proved this (she has never purported to do so), the matter of subjective intent would be utterly immaterial. As this Court well knows, when interpreting a transaction memorialized in a deed, it is not the parties' subjective, extrinsic intent that matters, but the *objective* intent gleaned from the parties' written words. *Cherokee Water Co. v. Forderhause*, 641 S.W.2d 522, 525 (Tex. 1982).

> Sans pleading of fraud, accident or mistake [ which did not occur in this case], extrinsic evidence is inadmissible to show, and the legal effect of the deed cannot be varied or changed by extrinsically showing, that the grantors intended an effect different from that

12

which the language of the deed clearly imports. *Kunkel v. Kunkel*, 515 S.W.2d 941, 949 (Tex. App-Amarillo 1974, writ ref'd n.r.e.), citing *Davis v. Davis*, 175 S.W.2d 226 (Tex. 1943).

Penny's loan theory, because it looks for validation outside the deeds' four corners, is an invitation to a worthless exercise. What is worse, it squarely contradicts the deeds' clearest objective intent.

### iii. The loan theory contradicts the controlling terms of *three* legal instruments.

Construction of an unambiguous deed is a question of law, to be adjudged *de novo* on appeal. *SAS Institute, Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005). The task is to ascertain the *objective* intent expressed within the deed's four corners. *Luckel v. White*, 819 S.W.2d 459, 461 (Tex. 1991); *see also Templeton v. Dreiss*, 961 S.W.2d 645, 657 (Tex. App.-San Antonio 1998, pet. denied) (the intention expressed in the deed controls over the expression that was intended). In doing so, the court should

- presume that the parties "intend every clause to have some effect and in some measure to evidence their agreement," *Woods v. Sims*, 273 S.W.2d 617, 620 (Tex. 1954); and

- attempt to harmonize all parts of the instrument, if at all possible, even if they might at first appear contradictory or inconsistent. *Id.*

Moreover, when the instrument at issue purports to be a deed, every effort should be indulged to conclude that it is in fact a deed and that some actual

13

interest has been passed. *Coker v. Roberts*, 9 S.W. 665, 667 (Tex. 1888); *see also Templeton*, 961 S.W.2d at 657; Bruce M. Kramer, "*The Sisyphean Task of Interpreting Mineral Deeds and Leases: An Encyclopedia of Canons of Construction*," 24 Tx. TECH L. REV. 1, 70 (1993). This common-sense harmonizing approach compels Consolidated's interpretation of the 1904 and 1907 deeds as conveyances and dooms any supposed "loan" theory. As Penny has admitted, the subject deeds simply make no mention of the transaction being a loan as opposed to a sale:

> Q: Is there anything in this deed [the 1904 deed] that mentions that being a loan?
>
> A: Well, you'd have to know the family history.
>
> Q: Well, I'm asking you about anything in this deed. **Is there anything in this deed [the 1904 deed] that mentions this being a loan?**
>
> A: **No.** 2 RR 18.

This is not at all surprising.

The controlling objective, legal intent is consistently expressed in not one but three solemnly acknowledged and recorded instruments – two deeds (executed years apart, by different grantors) and an intervening release of lien. These documents conclusively recognize a 1904 fee-simple sale of some 2370 acres, by J.O. Payne to W. A. Polley, with a later sale by W.A. Polley to J.O. Payne of a subset of those lands (the property now at issue).

14

*The 1904 deed memorializes
a fee-simple sale.*

The 1904 deed from Payne to Polley consistently and conclusively memorializes a fee-simple sale. PX 1 (Appendix B). To this end, the document:

- is titled as a deed, a term of art connoting the transfer of title. *Wilson v. Beck*, 286 S.W. 315, 320 (Tex. Civ. App.-Dallas 1926, writ ref'd) (deed is an instrument in writing, duly executed and delivered, conveying real estate); *Clark v. Widsom*, 403 S.W.2d 877, 882 (Tex. Civ. App.-Corpus Christi 1966, writ ref'd n.r.e.) (courts presume parties intended to effect conveyance when construing deed); BLACK'S LAW DICTIONARY, 8th edition (2005) (defines "deed" as "a written instrument by which land is conveyed");

- identifies the parties not as debtor and creditor or mortgagor and mortgagee but as *grantor* and *grantee*, terms characterizing participants in a real-property conveyance, BLACK'S LAW DICTIONARY, 8th edition (2005) (defines "grantor" as "one who conveys property to another");

- states that identified tracts of real property are "granted, sold, and conveyed," thus unmistakably indicating a sale, *see Hammett v. Farrar*, 29 S.W.2d 949, 957 (Tex. Comm. App. 1930) (grant, sell, convey mean a complete alienation);

- identifies the interest being granted as "all [of the identified] certain tracts or parcels of land" – in other words, the fee-simple estate; and

- is titled not merely as a deed but as a "Warranty Deed," which unequivocally commits the grantor to defend the fee-simple title conferred. *See* BLACK'S LAW DICTIONARY, 8th edition (2005) (defines "Warranty Deed" as a deed that expressly guarantees the grantor's good and clear title and covenants defense of title against all claims).

PX 1 (Appendix B). These terms must be given effect. *Luckel*, 819 S.W.2d at 462 (courts must strive to give effect to all provisions in a deed). That cannot happen

15

if the deed is downgraded to a mere security agreement.

*The 1906 release of lien reaffirms*
*the intended transfer of fee-simple title.*

In 1906, J. O. Payne executed a written, acknowledged and filed-of-record release. PX 3 (Appendix C). In that release, J. O. confirms that he in 1904 "convey[ed] unto W. A. Polley certain lands." In the release, Payne clearly affirmed – three times – that the 1904 instrument was a "deed." He also described the consideration for the 1904 sale as "cash consideration." And he concluded forcefully by stating that *he* released *Polley* and that he (Payne) in all respects quitclaimed the property to Polley. PX 3 (Appendix C) ("I [*i.e.*, J.O. Payne] here now release, relinquish and quit claim to said W. A. Polley the lands above described."). At this point, regardless what one might make of the 1904 deed, it is clear that Polley must hold the property's fee-simple title.

What has Penny made of this decisive document? At trial, she admitted it was, as purported, a release of lien.

> Q: . . . Do you see anything in there [the 1906 release] that mentions this being a loan?
>
> A: I don't.
>
> Q: **In fact, he's releasing the vendor's lien at this point; is that correct?**

16

A:  **Yes.** 2 RR 19.

*The 1907 deed likewise
reflects a fee-simple conveyance.*

Like the 1904 deed, the 1907 transaction is, by Penny's own admission,

objectively and unambiguously a conveyance of fee-simple title.

Q:  Is there anything in that deed, Exhibit No. 4 [the 1907 deed], that notes the transaction was the result of a loan or the payback of a loan?

A:  No. 2 RR19.

As proof of the objective intent to transfer fee-simple, the 1907 deed:

- is titled not as a loan but as a deed;

- identifies the parties not as debtor and creditor but as grantor and grantee;

- states that land is being "granted, sold, and conveyed";

- identifies the interest conveyed as all the described land, without restriction or reservation; and

- is titled as a "Warranty Deed" and in the accompanying text commits Polley to defend the title unconditionally. PX 4 (Appendix D).

Penny produced no evidence supporting a contrary deed construction. So the

deed's objective legal intent must be given effect, *Luckel*, 819 S.W.2d at 462,

which is impossible under Penny's loan theory.

What is worse, Penny's loan theory also ignores the fact that the quantum

17

of property transferred in the 1904 deed was considerably greater than that transferred in 1907 and the recited consideration for the 1904 transaction was also considerably greater. 2 RR17, 19, 20.  What effect would Penny's theory have on ownership of the remaining properties? Penny doesn't say.

**In summary:** The two 1900s deeds and the 1906 release triply prove that W.A. Polley, not J.O. Payne, entered 1907 as the owner of the subject land. The instruments' clear terms prove two conveyances of title – a 2380-acre conveyance from J.O. Payne to W.A. Polley, then, in 1907 a conveyance of a smaller number of acres from W. A. Polley to J. O. Payne. And absent proof of the exacting requirements for a separate-property acquisition during marriage, this quite simply means that Pearl in 1907 acquired a community one-half interest, which Frances and James Jr. inherited at her intestate death.

### b. The subject land was Pearl and J. O. Payne's community property.

Because the 1907 transaction was a purchase during marriage, the law presumes that the land is community property. Unless Penny rebuts it, this presumption is conclusive. Penny has not rebutted the presumption, nor could she. Thus, the subject land *was* community property, half of which Frances and James Jr. inherited at their mother's 1909 intestate death.

18

### i. Property acquired during marriage is presumed to be community property (and, absent proper tracing, this presumption becomes conclusive).

For over a century, Texas law has presumed that property acquired by a spouse during marriage is community property. TEX. FAM. CODE ANN. § 3.003(a); *Parker v. Coop*, 60 Tex. 111, 115 (1883). This presumption attaches even if a deed lists only one spouse as grantee, unless the deed includes an express separate-property recital.[10] *Robles v. Robles*, 965 S.W.2d 605, 615-16 (Tex. App.-Houston [1st Dist.] 1998, pet. denied). If the community-property presumption is challenged, a court resolves any doubt as to the character of the property in favor of the community estate. *Richardson v. Richardson*, 424 S.W.3d 691, 698 (Tex. App.-El Paso 2014, no pet.), citing *Irvin v. Parker*, 139 S.W.3d 703, 708 (Tex. App.-Fort Worth 2004, no pet.). The presumption cannot be defeated by surmise or speculation. *See McKinley v. McKinley*, 496 S.W.2d 540, 544 (Tex. 1973). To the contrary, absent clear and convincing evidence tracing separate-property consideration, the presumption is a conclusive one. *Lockhart v. Garner*, 298 S.W.2d 108, 110 (Tex. 1957).

---

[10] "A recital in an instrument of conveyance is considered to be a 'separate property recital' if it states that the consideration is paid from the separate funds of the spouse or that the property is conveyed to his or her separate property." *Roberts v. Roberts*, 999 S.W.2d 424, 432 (Tex. App.-El Paso 1999, no pet.).

## ii. The subject property was as a matter of law community property.

Here, the two tracts at issue were indisputably acquired during J. O. Payne's marriage to Pearl Leak, 2 RR 16, via the 1907 deed, which does not include any pretense of a separate-property recital. PX 4 (**Appendix D**) Consequently, Penny at trial had the unenviable burden of tracing the purchase-money consideration for a hundred-year-old transaction and of doing so to a level constituting clear and convincing evidence – that is, a "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."[11] *Pearson v. Fillingim*, 332 S.W.3d 361, 363 (Tex. 2011).

This burden is quite difficult, *Boyd v. Boyd*, 131 S.W.3d 605, 612 (Tex. App.-Fort Worth 2004, no pet.), and would remain so even without the requirement for clear-and-convincing proof. *Richardson*, 424 S.W.3d at 698 (tracing "involves establishing the separate origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property").[12] It is not enough to show that separate funds *could*

---

[11] TEX. FAM. CODE ANN. § 101.007.

[12] For cases in which the claimant's proof met the strict tracing requirement, *see*: *Zagorski v. Zagorski*, 116 S.W.3d 309, 316 (Tex. App.-Houston [14th Dist.] 2003, pet. denied) (husband called three tracing witnesses and produced documentary proof clearly establishing the source of funds in a foreign bank account as his separate property); *Faram v. Geritz-Faram*,

have been the source of a subsequent deposit of funds. Rather, the party asserting separate ownership must actually "trace the assets on hand during the marriage back to property that, because of its times and manner of acquisition, is separate in character." *Irvin*, 139 S.W.3d at 708. "[M]ere testimony that property was purchased with separate funds" without actually tracing the funds "is insufficient to rebut the community property presumption." *Richardson*, 424 S.W.3d at 698; *Irvin*, 139 S.W.3d at 708.

In contrast to the magnitude of her burden, speculation was all Penny brought to bear. Indeed, Penny at trial freely admitted both (1) that, after the passage of 110 years, she had no hope of tracing the purchase funds and (2) that the property was community property that Frances and James Jr. inherited. 2 RR 20, 21.

**Respecting her inability to trace:** Penny twice conceded that she lacked the records to even begin a tracing of funds.

> Q: [W]ith respect to where [the] money came from for the purchase of this property by Mr. Payne in 1907, do you have anything that would show the source of those funds?
>
> A: *I don't have any 110-year old records.* 2 RR 20.

---

895 S.W.2d 839, 843 (Tex. App.-Fort Worth 1995, no writ) (documentary proof fully tracing the source of funds); *Newland v. Newland*, 529 S.W.2d 105, 107 (Tex. Civ. App.-Fort Worth 1975, writ denied) (testimony corroborated with bank records and other documentary evidence).

\*\*\*

Q: Have you got any documents from Mr. Payne or Mr. Polley that would show the source of these funds that were used to purchase this property in 1907 as identified in Exhibit 4?

A: No. *Like I said, since they're 110 years old, I don't have them.* 2 RR 21.

**Respecting the community-property characterization:** Penny likewise admitted – three times – that the subject property was community property. 2 RR 26, 34, 36.

(i) Penny first admitted the property's community nature when discussing the effect of the 1916 deed, of a ½ interest, from J. O. Payne to Gertrude. Regarding this transaction, Penny was asked, "so at that point [*i.e.*, after the 1916 conveyance] Gertrude has one-half undivided; Frances and James Jr. retain a quarter [each]?" 2 RR 26. Penny replied, "exactly." *Id.* That admission could be true *only* if the property was acquired in 1907 as community property, such that Frances and James Jr. inherited Pearl's one-half community interest at her death. As of 1916, there was no deed into Frances and James Jr. and no other means for them to have acquired an interest in the subject property except by inheritance.

(ii) When discussing the 1931 deed, Penny again conceded that Frances and James Jr. Already owned a ½ interest by inheritance from Pearl. 2 RR 34.

22

("yes . . . it was their half interest they inherited"). Because J. O. Payne was living in 1931, Frances and James Jr. could not have inherited the property anywhere else but from Pearl's community property.

(iii) Barely two transcript pages later, Penny for a third time admitted the property's community characterization. 2 RR 36 ("it was her [Frances's] inheritance. They [Frances and James Jr.] inherited a half . . .").

These testimonial admissions meet all required elements of judicial admissions. *See Mendoza v. Fid. & Guar. Ins. Underwriters, Inc.*, 606 S.W.2d 692, 694 (Tex. 1980).[13] They were made at trial. They contradicted the ownership fractions embraced in Penny's theory of recovery and buttressed Consolidated's adverse theory of recovery. They were clear and deliberate. And their recognition as admissions is consistent with fairness, justice, and any relevant public-policy considerations. Penny's testimonial admissions thus were conclusive waivers of proof. *Id.*

Even without Penny's admissions, Penny's failure to offer rebutting

---

[13]Testimonial admissions will be judicial admissions when the testimony:

(1)     is made in a judicial proceeding;
(2)     contradicts an essential fact embraced in the theory of recovery or defense asserted by the person giving it;
(3)     is deliberate, clear, and unequivocal;
(4)     calls into play a public policy that it would be unjust to allow a party to recover after he has sworn himself out of court; and
(5)     is not also destructive of the opposing party's theory of recovery. *Mendoza,* 606 S.W.2d at 694.

23

evidence has rendered the community-property presumption conclusive. And for this reason, Consolidated's declaratory-judgment action should have been granted.

What is more, a 1960 partition deed signed by Penny's now-deceased husband, Jerry Payne, estops Penny from challenging the community-property character of the property during J. O. Payne's and Pearl's marriage. In Texas, the doctrine of estoppel by deed "precludes parties from alleging title 'in derogation of the deed *or denying the truth of any material fact asserted in it*.'" *XTO Energy Inc. v. Nikolai*, 357 S.W.3d 47, 56 (Tex. App.-Fort Worth 2011, pet. denied). The 1960 deed stipulates that Southland Paper Mills, Inc. owns an undivided ½ surface interest in the property. PX16. This surface interest derives straight from Pearl's community-property ½ ownership and from James Jr. and Frances's inheritance of that interest. Specifically, Southland received its ½ surface interest from James Jr. in 1954. PX15. James Jr. owned that ½ interest in the surface via two transactions: (1) inheritance of one-quarter surface interest from his mother Pearl, and (2) 1948 deed from Frances to James Jr. in which Frances conveyed to James Jr. a one-quarter surface interest. PX13. In order for James Jr. to have a ½ surface interest to convey to Southland in 1954, James Jr. must have received a one-quarter interest in the surface when his mother died. In other

words, when Jerry conceded Southland's ½ surface interest in 1960, he conceded the property's community character and Frances's 1909 inheritance. Penny's attempt to argue against these facts is "in derogation of" her husband's partition deed and thus an impermissible allegation.

### iii. Payne family members, through multiple transactions, recognized that the property was acquired in 1907 as community property.

Having failed to attempt the necessary tracing, Penny has argued that subsequent events in the property's title history might somehow nullify the property's community-property nature. *E.g.*, CR72-73 ("J.O. Payne treated the mineral interest owned by him as being 100% between December 17, 1907 and 1931, and . . . James Payne and Frances Payne Casey, made no claim to any interest in the minerals"); CR87 ("this title history indicates that the 492 acre tract was the separate property of J.O. Payne"). This is so far off base it is not even in the field of play.

For one thing, Penny's invocation of subsequent transactions is a bald attempt to circumvent her tracing burden. Any effort to do so is a nullity per current Texas law. *Roberts v. Roberts*, 402 S.W.3d 833, 838 (Tex. App.–San Antonio 2013, no pet.)(to overcome the community-property presumption, "a spouse must generally trace and identify, by clear and convincing evidence, the

25

property" claimed as separate property). The transactions Penny invokes, having occurred after the 1907 purchase, are as a matter of law incapable of altering the property's previously attached community-property character, a matter fixed at the time of acquisition. *Smith v. Buss*, 144 S.W.2d 529, 532 (Tex. 1940); *Welder v. Lamber*, 44 S.W. 281 (Tex. 1898);. *Colden v. Alexander*, 171 S.W.2d 328 (Tex. 1943). And finally, if events occurring after 1907 could hold any sway, it would not benefit Penny. The post-1907 transactions, when correctly understood, show the opposite of Penny's surmise. Indeed, Penny's predecessors in interest – including J. O. Payne (twice), Gertrude Payne (three times), and Gertrude's children – have through the years unmistakably recognized the property's community-property origin. To wit:

*J. O. Payne's 1916 deed:* J.O. Payne, in 1916, signed a deed conveying a ½ interest in the property and acknowledging this transferred his entire interest in the property. PX7 (" . . . do Grant, Sell, and Convey . . . *all* that certain tract . . . being a one-half undivided interest."). 2 RR 24. That recital is true only if Pearl Payne owned a community ½ interest.

*The 1938 leases:* In 1938, James Jr. and Frances each leased a one-fourth interest in the minerals to W.A. Bridges. PX 10; 2 RR 36, 39. They could do so only because in 1909 they had inherited a ½ community-property interest from

26

their mother, Pearl, such that the 1931 lease signed by J. O. Payne and Gertrude covered only Gertrude's ½ community-property interest (which J. O. Payne in 1916 had conveyed to Gertrude, PX 7). PX 8. Otherwise, the 1931 mineral lease would have bound the entire mineral interest.

*The 1945 timber deed:* Gertrude, James Jr., and Frances, in 1945, joined in a timber deed to Roy Williams. PX 12; 2 RR 44-45. If the property had been acquired in 1907 as J.O. Payne's separate property, J.O. Payne would have owned a ½ interest in the subject property at his death in 1936 (because, it is undisputed, J. O. Payne made only one surface-interest conveyance during his lifetime – the 1916 conveyance of a ½ interest in surface and minerals to his wife, Gertrude). If that had been the case, J. O. Payne's children by Gertrude would have inherited fractional interests in the surface and minerals at J. O. Payne's death, which would have made them necessary parties to the 1945 timber deed. But the children born to Gertrude were not parties to the timber deed, because *everyone then living – Gertrude, J. O Payne's children by Pearl, and Gertrude's own children – all understood that J. O. Payne had only owned a ½ community share.* PX 12; 2 RR 46.

*The 1948 surface deed:* Frances, in 1948, sold a one-quarter surface interest to her brother, James Jr. (referenced in the deed as James Payne

Bridges). There is no deed conveying any such surface interest to Frances. Thus, the only source of the interest Frances conveyed is inheritance out of her mother's community-property interest.

Penny outright conceded much of this in her testimony. *E.g.*, 2 RR 46-47 (admitting that under her separate-property theory, Frances would not have had any surface interest to transfer in 1948); 2 RR 44-45 (conceding "I have no idea" as to how Frances acquired any surface interest if the property had been J. O. Payne's separate property).

### 2. The 1931 mineral deed granted Frances and James Jr. the remaining half mineral interest in the subject property.

In the 1931 mineral deed, J.O. Payne and Gertrude by the clearest terms granted James Jr. and Frances the half interest that J. O. Payne, in 1916, had deeded Gertrude. PX9. The deed's unambiguous granting clause stated that J. O. Payne and Gertrude

> granted, sold, conveyed, assigned and delivered . . . unto the said grantees [*i.e.*, James Jr. and Frances], an undivided ½ interest in and to all of the oil, gas and other minerals in and under, and that may be produced from" the subject land. PX 9.[14]

---

[14] J.O. Payne's joinder in the 1931 deed is no evidence that he retained any mineral interest after in 1916 conveying his community-property half. Rather, as previously mentioned, for Gertrude to effectively convey the half interest deeded to her in 1916, the law then in effect dictated that J. O. Payne, as her husband, join in the transfer. In 1931, a married woman could not transfer even her separate real property unless her husband joined the conveyance. TEX. REV. CIV. STAT. ANN. art. 1299 (repealed 1963); *Blakely v. Kanaman*, 175 S.W. 674, 675

28

Then, the same deed committed J. O. Payne, Gertrude, and their successors to defend this grant against any opposing claims.

> [W]e do hereby bind our heirs, executors and administrators to warrant and forever defend, all and singular the said property unto the said grantees, herein their heirs, and assigns, and against every person whomever lawfully claiming or to claim the same or any part thereof. PX 9.

In a move contradicting virtually everything the law teaches about the rules for deed construction (*discussed later in this sub-section*), Penny proposes just to ignore these provisions. To this end, Penny at trial quite implausibly alleged that the deed wasn't meant to convey any of Gertrude's mineral interest but merely made it "official" that "the lease—half of the lease—belonged to James and Frances." 2 RR 33. With this position, Penny squarely contradicted *both* her prior pleading and her own trial testimony. CR 35 In the prior pleading, Penny explicitly conceded that the 1931 deed conveyed a half mineral interest:

> The other one-half (½) of the minerals in and under the above mentioned 493.02 acres was conveyed by mineral deed from J.O. Payne and wife, Gertrude Payne to James O. Payne Jr. and Frances Payne Casey, dated March 12, 1931 . . ." CR 35.

And at trial, Penny likewise admitted the 1931 deed was effective to pass a half mineral interest:

Q: But they did transfer the minerals, didn't they?

---

(Tex. 1915).

29

A: **They transferred half the minerals**. 2 RR 33-34.

Despite these admissions, Penny, through counsel, advocated an opposing interpretation of the 1931 deed. She did so based on a transparently wrong characterization of one proviso, deep within the 1931 mineral deed: a proviso stating that if the then-existing lease should expire, then James Jr. and Frances should enjoy half of post-lease benefits, "they owning one-half of oil, gas, and other minerals in and under said lands. . ." CR 86; *see also* CR 76.[15] Penny, through counsel, agreed this did not serve as a reservation. 2 RR 31 ("we'll concede there is not a reservation"). But she nonetheless sought the benefits of a reservation, maintaining that the proviso was a "recital[] . . . that the other one half was to be owned and retained by Mr. J.O. Payne and Gertrude Payne." 2 RR 8; *see also* 2 RR 31 ("there is a recital in there"). Gibberish. Either the deed reserves a mineral interest or it doesn't. Regardless, the cited proviso does not stipulate away what the same deed's granting clause has clearly conveyed. As Consolidated's witness, Bobby Moffett testified, that would take a *stipulation of interest* executed by all parties, or some other provision which the

---

[15] The 1931 mineral deed states "[i]t is understood and agreed that one-half of the money rentals which may be paid to extend the terms within which a well may be begun under the terms of said lease is to be paid to the said grantees and in event that the above described lease for any reason becomes cancelled or forfeited, then and in that event an undivided one-half of the lease interest and all future rentals on said land for oil, gas, and other mineral privileges shall be owned by said grantees, they owning ½ of all oil, gas and other minerals in and under said lands, together with ½ interest in all future revenues." PX 9.

30

1931 deed doesn't contain. 2 RR 67.

Per the clear rules for interpreting deeds, Penny's internally inconsistent interpretation of the 1931 deed cannot be tolerated if there is any plausible deed interpretation that *does* harmonize the deed's terms. *See Luckel*, 819 S.W.2d at 462. And there is. In fact, at the time of the 1931 transaction, the proviso Penny invokes (*i.e.*, the proviso stating that "they owning one half of all oil gas and other minerals . . .") was a standard "lease termination clause" commonly included in the "typical deed conveying a mineral interest subject to an existing lease." *See* Frank Elliot, *The Fractional Mineral Deed "Subject To" a Lease*, 36 TEX. L. REV. 620, 621 (May 1958). It had a recognized function, independent of whether the grantee claims additional mineral ownership acquired in other transactions. *Id.* And to this day the term has never – by any appellate court – been viewed as even potentially supporting a construction such as Penny proposes.

Instead, this proviso was commonly and consistently seen not as a recital, stipulation, or other commentary on the grantees' *total* ownership from all sources, but merely as part of a means for clearly delineating between the mineral interest conveyed in the granting clause and the potentially different splits of the contract rights conferred under existing and future leases. *See* Elliot,

31

36 Tᴇx. L Rᴇᴠ. at 621; *see also Patek v. Duncan*, 178 S.W.2d 577, 578-79 (Tex. Civ. App.–Galveston 1944, writ ref'd) (construing a nearly identical deed); *Richardson v. Hart*, 185 S.W.2d 563, 565 (Tex. 1945).

As of 1931, deeds conveying mineral interests subject to existing leases generally contained four key provisos (in three paragraphs), conveying two distinct estates: (a) a permanent interest in the minerals in place; and (b) an interest in whatever royalties may come due under the *existing* lease. *Woods v. Sims*, 273 S.W.2d 617, 621 (Tex. 1954); *Richardson,* 185 S.W.2d at 565. Such deeds:

(i) granted an undivided fractional interest "in and to all of the oil, gas and other minerals in and under, and that may be produced from" the land;

(ii) pronounced that the sale was "subject to the terms of" an existing mineral lease;

(iii) set out the fractional interest the grantee was to receive in the contractual rights under the existing lease, by stating that the deed "covers and includes" the stated fraction "of all the oil royalty and gas rental due and to be paid under the terms of said lease"; and

(iv) provided that if the existing mineral lease were to "for any reason become cancelled or forfeited," then all future royalties attaching to the mineral

32

interest being conveyed "shall be owned by said Grantee, he owning [the stated fraction] of all oil, gas and other minerals in and under said lands."

*Richardson,* 185 S.W.2d at 565.

So it is here.

The 1931 deed, which J. O. Payne and Gertrude granted subject to their existing 10–year mineral lease, provides:

- the grantors "grant, sell, convey, assign, and deliver unto the said grantees, an undivided ½ interest in and to all of the oil, gas, and other minerals in and under, and that may be produced from the following described land . . .";

- " . . . it is understood and agreed that this sale is made subject to the terms of said lease, but covers and includes ½ of all of the oil royalty, and gas rental or royalty, due and to be paid under the terms of said lease "; and

- " . . . and in the event that the above described lease for any reason becomes cancelled or forfeited, then and in that event an undivided one-half of the lease interest and all future rentals on said land for oil, gas and other mineral privileges shall be owned by said grantees, they owning ½ of all oil, gas and other minerals in and under said lease, together with ½ interest in all future rents." PX 9.

The deed thus created both a permanent interest in the minerals in place, stated in the granting clause, and a second estate in the oil royalty and gas rental due under the then-existing lease. The proviso Penny misconstrues by no means speculated upon any mineral ownership the grantees may or may not have acquired independently, apart from the deed. Nor did it countermand the deed's

granting clause. *See, e.g., Richardson*, 185 S.W.2d at 565; *Patek*, 178 S.W.2d at 579 (construing almost identical deed to grant a ½ mineral interest). In fact, when, as here, the fraction stated in the lease termination clause does not vary from the fractions in the granting and royalty-transfer clauses, the job of the court is simple. *See* Elliot, 36 TEX. L. REV. at 624. In such cases, the deed is effective to convey the fractional mineral interest stated in the granting clause and later restated in the lease termination clause. *Id.*; *accord Richardson*, 185 S.W.2d at 563; *Patek*, 178 S.W.2d at 579.

Penny's contrary and outlandish position relies on speculation and ignores and contradicts the deed's key terms, such as "deed," "grant," "convey," "½ of *all*" "warrant," defend" and the like. It thus is inimical to deed construction. Penny would have the 1931 deed pass no mineral interest at all, rendering the granting clause toothless surplusage, such that there would be nothing for J. O. Payne or Gertrude to warrant and defend. Penny thus fails to harmonize the deed's terms. Rather, she approaches its construction as a party in search of conflict.

It is borderline silly to even think that reasonable parties would sign a solemn warranty deed if they subjectively intended merely to acknowledge a prior inheritance. And in any event, subjective intent has no sway over a deed's

34

controlling, objective terms.

Consolidated, on the other hand, construes the straightforward deed as doing exactly what it says – conveying a one-half mineral interest to Frances and James Jr. This construction meets all cannons of deed construction. It (i) passes an interest, (ii) gives effect to every clause, (iii) harmonizes the deed, and (iv) comports with how other courts have interpreted nearly identical deeds. *See, e.g. Patek v. Duncan*, 178 S.W.2d 577, 578 (Tex. Civ. App.-Galveston 1944, writ ref'd). Contrary to Penny's assertion, the deed does not begin to estop the grantees from claiming both the interest the deed conveys and the interest they already owned through intestate succession.

Penny's construction of the 1931 deed makes it all but impossible for oil-and-gas attorneys to write title opinions, without which the entire industry would grind to a halt. Under Penny's view, every time a title attorney sat to examine a deed containing the common lease-termination clause – that is, in just about every examination of a mineral title located in an area prospective for oil or gas in the 1930s through 1960s – the lawyer would be at a loss to construe the deed from within its four corners. According to Penny, no deed made subject to an existing lease could be sorted out without first plumbing the extrinsic matter of the grantee's other, independently-sourced ownership interests.

Think of how Penny's deed analysis would work: By Penny's reasoning, if Frances and James Jr. didn't already own any mineral interest in the subject property, the 1931 deed would afford them a full half mineral interest. But if they happened to have already procured a quarter mineral interest elsewhere, Penny would say that the same deed conveyed only an additional quarter interest. And if, as is the case here, the grantees already had inherited a half mineral interest, Penny would say that this same deed, expressing the same objective intent, was ineffectual to convey anything at all. That simply is not how deed construction works.

**B. Taken together, the 1907 and 1931 deeds conclusively negate Penny's position on mineral ownership and confirm Consolidated's right to judgment.**

Going into 1931, Gertrude owned a ½ mineral interest (the interest that J. O. granted her in 1916). No one disputes that. The 1931 mineral deed, as a matter of law, conveyed that interest to Frances and James Jr. And because Frances and James Jr. already owned Pearl's half mineral interest through intestate succession, this also means they after the 1931 mineral deed, collectively owned the subject property's entire mineral interest. Nothing in the 1931 deed could have estopped Frances or James Jr. from claiming this ownership or could now estop Consolidated and the rest of Frances's successors

from claiming their rightful mineral interests. *E.g.*, 2 RR 85, 124-25.[16]

Now, knowing both that the property was a community asset of Pearl and J. O. Payne and the 1931 deed transferred an undivided ½ mineral interest, the chain of mineral title into Frances's successors in interest is decisively established, as depicted visually then described verbally, on the following two pages:

---

[16]Penny also incorrectly asserts that James Jr. and Frances recognized that they collectively owned only a ½ interest in the minerals when, in 1938, they each leased only a 1/4 interest in the minerals. CR 87. This too is foolishness. The simple answer is that in 1938 the ½ interest they acquired by intestate succession back in 1909 was the only quantum of interest not under existing lease. They had acquired the other one half in 1931 subject to the pre-existing 10-year lease. PX 8.



MI = Mineral Interest
SI = Surface Interest
CP = Community Property

J.O. Payne
100% MI & 100% SI

1904 deed (PX1)

W.A. Polley
100% MI & 100% SI

1907 deed (PX4)

J.O. Payne
50% CP MI & 50% CP SI

Pearl Payne
50% CP MI & 50% CP SI

Pearl dies 1909 intestate

James Jr.
25% MI & 25% SI

Frances
25% MI & 25% SI

1916 deed
(PX7)

Gertrude Payne
50% MI & 50% SI

1931 mineral deed (PX9)

Gertrude
50% SI

James Jr.
50% MI & 25% SI

Frances
50% MI & 25% SI

Surface deed (PX13)
(Frances to James)

James Jr.
50% MI & 50% SI

Mineral deed
(PX14)
(Frances to Shelby)

Frances
50% MI

1952 deed (PX15)

J.T. Shelby
25% MI

Frances
25% MI

Southland Paper Mills
50% MI & 50% SI

• • •

• • •

1960 partition deed (PX16)

Gertrude
0%/100%* SI

Southland Paper Mills
50% MI & 100%/0% SI

Consolidated et al
25% MI

Consolidated et al
25% MI

*After the partition, Gertrude owned 0% of the surface interest in the 127 acre tract and 100% surface interest in the 492 acre tract; The percentages for Southland are the reverse.

When Pearl died intestate, her community half interest (surface and minerals) passed to her children, Frances and James Jr. *See* TEX. PROB. CODE ANN. §45 (repealed) (under intestate-succession rules, children inherited their deceased parents' community interests). In 1916, J. O. Payne conveyed his entire community half interest (surface and minerals) to his new wife, Gertrude. PX 7. Fifteen years later, Gertrude (joined by J. O., as law then required) conveyed her half mineral interest to Frances and James Jr., equally. PX 9. At that point, Gertrude owned a half surface interest while Frances and James Jr. each owned a half mineral interest and a quarter surface interest in the subject property.

In May 1948, Frances sold her quarter surface interest to her brother. PX 13. Weeks later, she sold a quarter mineral interest to J. T. Shelby. PX 14. The property was then owned: Gertrude - a half surface interest, no minerals; James Jr. - half interests in both surface and minerals; Shelby - quarter mineral interest; Frances - quarter mineral interest.

In 1952, James Jr. conveyed his entire interest (surface and minerals) to Southland Paper Mills. PX 15. Eight years later, Gertrude and her children, including Jerry Payne, signed a partition deed conveying to Southland Gertrude's half surface interest. PX 16. At that point, the property was owned: Southland - the entire surface estate and a half mineral interest; Shelby - a quarter mineral interest; Frances - the final quarter mineral interest.

Today, Consolidated and various Frances Casey heirs are successors to Frances's quarter mineral interest. 2 RR 57, 124. Consolidated also owns a second fraction of the subject property's minerals, which it bought from J. T. Shelby.

The Court should reverse and render judgment (1) declaring that the 1907 deed created a community-property interest and (2) ordering that Penny take nothing on her counterclaims.

## II. Consolidated is entitled to recover declaratory-judgment attorney's fees.

In addition to reversing the trial court's judgment, the Court should render judgment that Consolidated is entitled to attorney's fees, and then remand the issue of the amount of attorney's fees.

Under the Uniform Declaratory Judgments Act, a trial court may in its discretion award costs and attorney's fees. TEX. CIV. PRAC. & REM. CODE §37.009. A decision not to award attorney's fees thus is reversible for abuse of discretion. *State Farm Lloyds v. C.M.W.*, 53 S.W.3d 877, 893-94 (Tex. App.-Dallas 2001, pet. denied). Here, the trial court found against Consolidated on the merits, so it never reached the question of Consolidated's recovery of attorney's fees. But this Court, on reversing the trial court's merits ruling, should declare that Consolidated is entitled to recover its reasonable attorney's fees. A reversal on attorney's fees is proper where the appellate court reverses the merits of a declaratory-judgment claim. *See Kachina Pipeline Co., Inc. v. Lillis*, ___ S.W.3d ___, 2015 WL 3653272 at *7 (Tex. June 12, 2015) (attorney's fee award was properly reversed on appeal after appellate court correctly reversed trial court's declarations); *see also SAVA gumarska*

*in Kemijska industria d.d. v. Advanced Polymer Sciences, Inc.*, 128 S.W.3d 304, 325 (Tex. App.-Dallas 2004, no pet.).

In the context of this case, a failure to award Consolidated its attorney's fees would be an abuse of discretion.[17] Consequently, in rendering the judgment that the trial court should have rendered, the Court should order that Consolidated recover its reasonable attorney's fees, with the amount of the fee award to be determined by the trial court, in a limited remand. Alternatively, if the Court does to render judgment that Consolidated recover its attorney's fees, the Court should in that even remand all issues concerning Consolidated's request for fees, including liability as well as the fee amount.

## Conclusion and Prayer

For the reasons stated, the Court should:

(1)     reverse the judgment of the trial court,

(2)     declare that through the 1907 deed Pearl and J. O. Payne acquired the subject lands as their community property,

---

[17]Indeed, the necessity for this suit falls squarely on Penny's shoulders. Before this lawsuit, Consolidated asked Penny to provide Consolidated the basis of appellee's ownership claim so that Consolidated could correctly assess its ownership claim and create a title opinion. Her counsel claimed to have documentary proof of Penny's claim and would forward it. Then, months later, Penny's position changed. Counsel still claimed to have possession of documentary proof but refused to furnish it. So Consolidated had to file suit. Now, the trial has proved that there never were any such documents.

41

(3)    render judgment in part that (a) Penny Payne take nothing and (b) Consolidated recover its reasonable attorney's fees, and

(4)    direct a limited remand, for further proceedings determining the proper attorney's fee amount (or, alternatively, remand the issue of entitlement to, as well as the amount of, Consolidated's attorney's fees).

Consolidated of course also requests all other relief, additional or subsidiary, that this appeal authorizes.

Respectfully submitted,

/s/ Greg Smith

| | |
|---|---|
| BRENT L. WATKINS | GREG SMITH |
| Texas Bar No. 24033312 | Texas Bar No. 18600600 |
| SKELTON SLUSHER | Nolan Smith |
| 1616 S. Chestnut | Texas Bar No. 24075632 |
| Lufkin, Texas 75902 | RAMEY & FLOCK, P.C. |
| Telephone:  936-632-2300 | 100 E. Ferguson, Suite 500 |
| Facsimile:   936-632-6545 | Tyler, Texas 75702 |
| bwatkins@skeltonslusher.com | Telephone:  903-597-3301 |
| | Facsimile:   903-597-2413 |
| | gsmith@rameyflock.com |
| | nolans@rameyflock.com |

**COUNSEL FOR APPELLANT**

## Certificate of Service

This brief was served electronically and via email, in accordance with the applicable Texas Rules of Civil Procedure, on this the 11th day of September, 2015, on the following:

**Via email katiecmorgan@yahoo.com**
John H. Seale
Attorney at Law
P. O. Box 480
Jasper, TX 75951


/s/ Greg Smith
Greg Smith


## Certificate of Compliance

1.     This brief complies with the type-volume limitation of TEX. R. APP. P. 9.4 because it contains 9675 words, excluding the parts of the brief exempted by TEX. R. APP. P. 9.4(i)(2)(B).

2.     This brief complies with the typeface requirements of TEX. R. APP. P. 9.4(e) because it has been prepared in the proportionally spaced typeface using Word Perfect X5 in 14 point Garamond font.

Dated: September 11, 2015.


/s/ Greg Smith
Greg Smith

43

# No. 12-15-00105-CV

## In the Twelfth Court of Appeals
## Tyler, Texas

**Consolidated Property Interests, LLC**
*Appellant*

**v.**

**Jerry Payne and Penny Payne**
*Appellees*

*Appealed from the 273rd Judicial District Court*
*Sabine County, Texas*

### APPENDICES

A.    Judgment

B.    1904 Deed (J. O. Payne to W. A. Polley)

C.    1906 Release

D.    1907 Deed (W. A. Polley to J. O. Payne)

E.    Consolidated's Request for Findings and Conclusions

F.    Certificate of Mailing

# Appendix Tab A

IN THE DISTRICT COURT OF SABINE COUNTY

STATE OF TEXAS



FILED
AT 9:30 O'CLOCK A M
MAR 13 2015
TANYA WALKER, Clerk District Court
Sabine County, Texas
By_____

CONSOLIDATED PROPERTY §
INTERESTS, LLC §
§
VS. §  NO. 12,827
§
JERRY PAYNE AND PENNY PAYNE §

## JUDGMENT

It is ORDERED, ADJUDGED and DECREED that the Judgment rendered and signed by this Court on February 24, 2015 is hereby vacated and set aside, and this instrument now becomes the Judgment in this case.

On the 15th day of January, 2015, came on to be heard the above-entitled and numbered cause, in which Consolidated Property Interests, LLC was the original Plaintiff and Jerry Payne and Penny Payne were the original Defendants, and then Jerry Payne and Penny Payne were Counter-Plaintiffs and Consolidated Property Interests, LLC was Counter-Defendant, and Jerry Payne and Penny Payne were Cross-Plaintiffs, and Consolidated Oil & Gas, LLC, Edna Beatrice Casey, Debra Lynn Casey Berry, Christopher Eric Casey and Rachelle W. Casey were Cross-Defendants. Jerry Payne died during the pendency of the suit, and before the trial, and all interests of Jerry Payne passed to Penny Payne as a result of the will of Jerry Payne, deceased.

238

Plaintiff and Counter-Defendant Consolidated Property Interests, LLC appeared by its representative and its attorney, Defendant and Counter-Plaintiff Penny Payne appeared in person and by her attorney, and Cross-Defendants Consolidated Oil & Gas, LLC, Edna Beatrice Casey, Debra Lynn Casey Berry, Christopher Eric Casey and Rachelle W. Casey appeared by counsel only, and all parties announced ready for trial. Thereupon, the parties submitted the matters in controversy, of fact as well as of law, to the Court without the intervention of a jury. The Court heard the evidence and the argument of counsel, and is of the opinion that judgment should be rendered in favor of the Defendant and Counter-Plaintiff Penny Payne, and against Plaintiff and Counter-Defendant Consolidated Interests LLC, and against Cross-Defendants Consolidated Oil & Gas, LLC, Edna Beatrice Casey, Debra Lynn Casey Berry, Christopher Eric Casey and Rachelle W. Casey.

It is therefore ORDERED, ADJUDGED and DECREED that Plaintiff Consolidated Interests, LLC take nothing against Defendant Penny Payne, and that Counter-Plaintiff Penny Payne is awarded title to and possession of one-half (1/2) of the oil, gas and other minerals in and under the land originally described as follows:

> "One Tract known as the Polley old place in Sabine County, Texas, containing about 400 acres a part of the John Frazier original survey beginning at a corner on the Colerow creek at a stake from which a gum stands 5 feet marked J. P. and on iron wood 8 feet and a water oak both marked J. P. Thence down said creek with its various meanderings to the Patroon Creek. Thence up said Patroon Creek with its meanders to the bridge across said creek on the road leading from Sexton to East Hamilton. Thence along and with said road towards Sexton it being the North West boundary line to where the Sexton and Milam intersect each other. Thence down said Sexton and Milam road towards Milam it being the South boundary line to the Place of beginning."

239

And:

"130 acres of John McAdams, in Sabine Co. about one mile S.E. from Sexton, on Milam on Old Sexton road, on the west side of the Patroon Creek, about 1 mile S. E. from the town of exton, and this survey includes W. A. Polley Farm, on a 260 acre Survey on the John McAdams Survey: Beginning at the S. E. Cor. of said farm on the west bank of Patroon Creek. Witness an elm brs. S 17 3/4 E 1 2/5 vrs. a Sweet gum brs S. 55 1/2 E. 10 vrs. maple brs S. 28 1/4 E. 6 25 vrs. Then S. 44 E. 540 vrs. to Cor. a Sweet gum brs N. 44 W. 1 2/5 vrs. a Sweet gum brs. N. 1 1/2 W. 1 1/2 vrs. Thence S. 3 3/4 W. 220 vrs to Cor. in Sexton & Milam road a post oak brs. N. 12 W. 4 2/5 vrs. a pine brs. N. 68 W. 5 2/5 vrs. Thence with said road as follows. 1st N. 65 W. 187 vrs. 2nd, N. 44 W. 310 vrs. Robert Lolley North Cor. on with said road N. 35 1/2 W. 182 vrs., 2nd N. 59 1/2 W. 220 vrs., 3rd, N. 23 1/2 W. 168 vrs. to Cor. On the Colorow Creek just below the witness a white oak brs. S. 67 W. 4 vrs. a pine brs. W. 68 E. 3 1/5 vrs. Thence down the creek with its meanders its general course being W. 62 1/4 E. 1350 vrs. to mouth of said creek thence down the Patroon Creek S. 41 1/2 E. 80 vrs. to place of beginning bearing marked X. Variation 8 East Survey March 12, 1906 by Jim A. McLaurin Survey of San Augustine Co."

The Court finds that this is the same land described after re-surveys as 492.02 acres in the John Frazier Survey, Abstract 104, and 127.58 acres in the John McAdams Survey, Abstract 159, Sabine County, Texas, such tracts being described by metes and bounds in the surface only Partition Deed between Southland Paper Mills, Inc. and Gertrude Payne, a widow, et al, dated November 12, 1950, and recorded in Vol. 94 at Page 635 of the Deed Records of Sabine County, Texas.

The Court finds that after the execution of the instrument dated March 12, 1931, and recorded in Vol. 34 at Page 613 of the Sabine County Deed Records, in which J. O. Payne and wife Gertrude Payne were Grantors, and James O. Payne, Jr. and Frances Casey were Grantees, and considering the recitals in such instrument, that the Grantees were the owners

240

of 1/4 of the minerals each, and the Grantors together were the owners of the remaining 1/2 of the minerals in and under the above described land. The Court finds that the 1/2 interest in the minerals then owned by J. O. Payne and Gertrude Payne passed by virtue of legal instruments and inheritance to Defendant and Counter-Plaintiff Penny Payne, the 1/4 interest in the minerals then owned by Frances Casey was conveyed by Frances Casey to J. T. Shelby by mineral deed dated March 15, 1949, and recorded in Vol. 64 at Page 100 of the Sabine County Deed Records, and is now owned by the heirs or assigns of J. T. Shelby, and the 1/4 interest in the minerals then owned by James O. Payne, Jr. is now owned by the heirs and assigns of James O. Payne, Jr. The Court further finds that the Cross-Defendants Consolidated Oil & Gas, LLC, Edna Beatrice Casey, Debra Lynn Casey Berry, Christopher Eric Casey and Rachelle W. Casey have no interest in the minerals, since their claim would come only as heirs as Frances Casey, and the said Frances Casey, deceased, owned no interest in the minerals after she conveyed her 1/4 interest to J. T. Shelby as set forth above.

This Judgment finally disposes of all parties and all claims and is appealable.

Costs of Court are adjudged against the Plaintiff and Counter-Defendant Consolidated Property Interests, LLC.

RENDERED and SIGNED this _13th_ day of March, 2015.

_____
JUDGE PRESIDING

241

# Appendix Tab B

DEED

CERTIFIED COPY 4-c___, 20 13
Attest: _____
JANICE McDANIEL, County Clerk
Sabine County, Texas
By _____, Deputy

administrators to Warrant and forever Defend all and singular the said premises unto the said W.R. Davis his heirs and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof.

Witness our hands at Bronson Tex this 12th day of August A.D. 1903.

Signed, sealed and delivered in presence of E.P. Padgett Notary Public Sabine Co. Tex.

I.F. Chance

A. J. [her X mark] Chance

The State of Texas } Before me E.P. Padgett a Notary Public in and for said County County of Sabine } on this day personally appeared I F Chance known to me to be the persons whose names are subscribed to the foregoing instrument, & acknowledged to me that he executed the same for the purposes and consideration therein expressed; and also came Mrs. A.J. Chance wife of I.F. Chance known to me to be the persons whose name is subscribed to the foregoing instrument, and having been examined by me privily and apart from her husband, and having the same fully explained to her the said A.J. Chance acknowledged such instrument to be her act and deed, and declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

Given under my hand and seal of office, this 12th day of Aug. 1903.

E.P. Padgett Notary Public
Sabine County Texas.

[L.S.]

Note: The words "corner 150 varas" on line 37 page 288 erased as in original.

I hereby certify that the foregoing instrument was filed in my office for record on the 2nd day of March A.D. 1905 at 2 o'clock P.M. and duly recorded on this the 3rd day of March A.D. 1905 at 5 o'clock P.M.

J.A. Watson Co. Blk. Co. S.T.

By S.R. Williams Deputy.

Filed for record this 3rd day of March 1905 at 8 o'clock A M J.A. Watson Clerk Co. Ct. Sabine Co. Texas

The State of Texas } Know all men by these Presents: That I County of Sabine } James Payne of the County of Shelby in the State aforesaid for and in consideration of the sum of Eleven Thousand Eight Hundred and Fifty and 00/100 Dollars to me paid and secured to be paid by W.A. Polley as follows have Granted, Sold and Conveyed, and by these presents do Grant, Sell and Convey unto the said W.A. Polley of the County of Sabine State of Texas, all that certain tracts or parcels of lands as follows 400 Hundred acres Jno Fragier H'd Right in Sabi Co. Tex. 250 acres of the Jno W Adams Survey, in Sabine Co. Tex.

XHIBIT
1

DEED T

CERTIFIED COPY
Attest: _____ 42 , 20 13
JANICE McDANIEL, County Clerk
Sabine County, Texas
By _____, Deputy

290

Warranty
Deed

James O.
Payne &c

Filed for
record this
the 25th
day of
Feby A.D.
1905 at
9°° o'clock
A.M.W.
C Garrett
County
Clerk By
&S Garrett
Deputy

25 acres Jno Horton Survy in Sabine Co. Tex. 240 acres Simon Smith in Sabine Co. 500 acres Rich & Hailey Survey in Sabine Co. Tex. 500 acres W.B. Frazier Hd Right in Sabine Co. Tex. 167½ acres Edmond Quick in San Augustine Co. Tex. 297½ acres of the Jno S. Lane in Sabine Co. Tex. and W.A. Polley for a more complete description of said lands reference is hereby made to Deed from Bessie Payne Burns and John B Burns W.A. Bridges and Lucy Payne Bridges to J.O. Payne and to Deed Records of Sabine and San Augustine counties.

To have and to hold the above described premises, together with all and singular the rights and appurtenances thereto in anywise belonging, unto the said W.A. Polley, his heirs and assigns forever, and I do hereby bind myself my heirs, executors and administrators, to Warrant and Forever Defend all and singular the said premises unto the said W.A. Polley his heirs and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof.

But it is expressly agreed and stipulated that the Vendors Lien is retained against the above described property, premises and improvements, until the above described note and all interest thereon, are fully paid, according to face and tenor, effect and reading, when this deed shall become absolute.

Witness my hand at Sixton Tex this 10 day of May A.D. 1904

James O. Payne

The State of Texas) Before me H. McDuffie Justice Peace in and County of Sabine { for Sabine County, Texas, on this day personally appeared James O. Payne known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office, this 12 day of Jany A.D. 1905

H. McDuffie

The State of Texas } I. W.J. Garrett Clerk of the County Court of County of San Augustine said County, do hereby certify that the foregoing instrument of writing, dated on the 10 day of May A.D. 1904, with its Certificate of Authentication, was filed for record in my office this 25 day of Feby. A.D. 1905, at 9°° o'clock P.M. and duly recorded this 27 day of Feby A.D. 1905, at 3 o'clock P.M. in the Deed Records of said County, in Volume 33 on page

Witness my hand and the seal of the County Court of said county, at office in San Augustine the day and year last above written.

# Appendix Tab C

56

I hereby certify that the foregoing instrument was filed for record in my office on the 22nd day of March 1906 at 8 o'clock A.M. and/recorded duly on the 29th day of March 1906 at 1 o'clockP.M.

J. A. Watson   Clerk Co. Ct.

By: W. H. Smith  Deputy                    Sabine County, Texas.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

RELEASE OF VENDOR'S LIEN

J.O. PAYNE

TO                          Filed for record March 28, 1906 at 3 o'clock P.M.

W. A. POLLEY

STATE OF TEXAS

COUNTY OF SHELBY      KNOW ALL MEN BY THESE PRESENTS, That Whereas I James O. Payne of San Augustine, County, Texas, did on the 10th day of May A.D. 1904 convey unto W. A.Polley certain lands as described in said deed the same being recorded in Volume T. pages now. 289, 290 and 291, deed records of Sabine County, Texas, and whereas, There is a recital in said deed that a Vendor's Lien was retained to secure the payment of money as specified in said deed when in truth and in fact the consideration for said lands was a cash consideration though said deed recites that a Vendor's lien was retained, and I here now release, relinquish and quit claim to said W. A. Polley the lands above described free from the line aforesaid.

James O. Payne

STATE OF TEXAS

COUNTY OF SHELBY      BEFORE me J. M. Sanders County Judge of Shelby County, Texas, personally appeared James O. Payne known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal on this the 27th day of March A.D. 1906.

(L.S.)                                J. M. Sanders County Judge

Shelby County, Texas.

I hereby certify that the foregoing instrument was filed for record in my office the 28th day of March 1906 at 3 o'clock P.M. and duly recorded the 30th day of March 1906 at 5 o'clock P.M.

J. A. Watson    Clerk Co. Ct.

by:  W. H. Smith, Deputy                    Sabine County, Texas.

CERTIFIED COPY
Attest: ___7-10-___, 20_13_
JANICE McDANIEL, County Clerk
Sabine County, Texas
By: _Jamie Clark_, Deputy

EXHIBIT
3

DEED

W. A. POLLEY

TO ·         Filed for record March 28, 1906 at 3 o'clock P.M.

W. A. PICKERING

STATE OF TEXAS

COUNTY OS SABINE      KNOW ALL MEN BY THESE PRESENTS, That I, W. A. Polley

of the County of Sabine and State of Texas, for and in consideration of the

Sum of Fifteen thousand seven hundred fifty three & 75/100 ($15753.75) dollars

to me paid and secured to be paid by W. A. Pickering as follows: Five thousand

two hundred and fifty one and 25/100 ($5251.25) Dollars cash the receipt

of which is hereby acknowledged and two promissory notes of even date with

this deed amount of Five thousand two hundred and fifty one and 25/100 dollars

each with 6% interest from date until paid. Interest payable anually as it

accrued; said notes due and payable respectively on or before 12 months and

24 months after date executed by W. A. Pickering in favor of said W. A. Polley

each retaining Vendor's lien on the hereinafter described tracts of land;

have granted, sold and conveyed and by these presents do grant, sell and

convey unto the said W. A. Pickering of the County of Jackson and State of

Missouri, all those certain tracts of land situated in Sabine County, Texas,

and more definitely described as follows, to wit:

     1st TRACT: Eight hundred and sixty nine acres a part of the W. R. Frazier

H. R. Survey, which comes out of a 1029 acre tract which is described as

follows, to wit: Beginning on the right bank of Sabine River at the N. E.

corner of a Survey made for John Boyd first corner a stake from which a red oak

marked J bears N 10 E 6 5/10 varas hickory markes XS 44 W 18 varas. Thence

North 80 deg. West 2690 varas to second corner stake pine marked B bears

N. 32 W 8 5/10 varas Hickory mkd X. S. 32 E 4 5/10 varas, Thence South 25

West 1900 varas on Boyds W. B. the third corner on N. B. line of R. Slaughter

Survey a beech mkd. B. S. 32 E 16 varas argum N 3 E 12 varas. Thence N

65 W 1200 varas fourth corner stake white oak S 30 W mkd R. H 1 vara Black

oak 88 East 4 varas Thence N 25 E on Tippet and nalys line 2400 vrs. to

the fifth corner A Morrises S. W. Corner a stake pine N 10½ W 15 vrs. Red

oak S. 43 E 230 vrs. Thence S 65 E 1400 vrs. to Morrisons line 1480 varas to

sixth corner stake gum N 64 E 12 varas black oak N 73 E 10 varas, Thence

N 27 deg. E. on Morrises E. B. line 1400 varas to seventy corner on S. bank

of Martinas Bayou stake gum marked A.M. S 48 W 10 2/10 varas red oak S 34

W 10 varas. Thence down the bayou with its banks S 62 E 405 varas to stake

at the mouth of the Creek a black oak S 10 varas Blck oak 65 W 12 4/10

varas. Thence down the river with its meanders S 23 E 1000 varas S 55 E 1000

varas S 14 E 600 vrs to the beginning, containin 1029 acres of land excepting

out of this Survey 160 acres sold to W.H. Bennett which begins at Bennetts

CERTIFIED COPY

Attest 9-16 2013

JANICE MCDANIEL, County Clerk

Sabine County, Texas

Janice Clark     Deputy

N. E. corner of his home place on the Sabine River thence up said Sabine River a sufficient distance to a corner, Thence West a sufficient distance to a corner, Thence South to W.H. Bennett N. Boundary line, Thence with Bennetts N. B. line to the place of beginning so as to contain 160 acres of land in s square shape, which leaves out of said 1029 acres tract 869 acres intended to be conveyed by this deed to the said W. A. Pickering.

2nd TRACT: 662½ acres of land of the Richard Haley league Survey lying on the Martines Bayou, Beginning at a point on the E. B. line of the Richard Haley Survey S. 26 deg. W 100 vrs. from where the Richard Haley line crosses the Martinas Creek witness a Hickory mkd. X Thence S 86 D deg. W 430 vras to a corner a beach brs. S 35½ deg E 2 2/5 vrs. Thence N 41½ SW504 vrs. to a corner a post oak brs. S. 41½ deg E 1 1/5 vrs. a pine brs. S 35 deg W 4 2/5 vrs. Thence N 30½ deg 154 vrs. to corner on the Martinas Creek witness a White Oak brs. 51 deg. E 1 vara, Thence up said creek with the meanders as follows, to wit: 1st. N 44 deg. W 1050 vrs. 2nd. N 83-18 W 320 vr. 3rd. N 35 deg. W 2 0 vrs. to corner said Creek a beach brs. S 8 deg. W 7 vrs. a beach brs. N. 70 deg. W 12 vrs. Thence S. 30 deg W at 730 vrs. a road to Palmers at 790 vrs. same road again at 1120 varas corner a pine brs. N 33 deg. W 6 vrs. Thence with the old palmer road as follows: 1st S 42½ deg E 95 varas 2nd S 15 deg. W 100 varas, 3rd. S 50½ deg W 100 varas, 4th S 68½ deg W 100 varas, 5th S 23½ deg W 180 varas, 6th S 26 deg. W 100 varas to the n. E. corner of a 188 acre survey made for W. A. Polley on with the old Palmer road also called the Polley and Payne old mill road 7th S 32½ deg W 230 varas 8th S 43 W 140 9th S 41½ W 115 varas 10th S 55 deg W 362 varas to corner on the S. B. line of the Richard Haley Survey being the S. E. Corner of W.A. Polley 188 acre Survey Witness a pine brs. N 24 deg. E 5 3/5 vrs. varas a post oak brs. S 68½ deg. W 4 3/5 varas, Thence S 64 E on Haleys S. B. line 1800 vrs. to corner in the road leading from Sexton to East Hamilton witness a pine brs. N. 44 W S 3/5 varas, Thence with said road as follows 1st N 41 deg E 400 varas 2nd North 64 deg. E 230 varas 3rd 65½ E 145 varas. 4th N 17 deg East 285 varas, 5th N 56 deg E 285 vars, 6th N 57 deg E 187 vrs. to the corner on the East side of a Spring Branch just below the Spring a sweet gum brs. S. 45½ deg W 1 vara an ironwood brs N 44½ E 1 3/5 varas, Thence S 24 deg E 174 varas to corner of the Sexton and East Hamilton road a pine bs. S 39 deg. E 7 4/5 vrs. Thence with said road as follows: 1st N 73 deg E 101 vrs. 2nd N 35½ E 280 vrs. 3rd N 55 E 135 vrs. to Haleys E. B. line Thence N 26 E with S said line 290 varas to the place of beginning. The above field notes includes 795½ acres less 133 acres sold to Wiggins leaving 662½ acres which this tract was ound to contain by an actual Survey by J. A. McLanrin Surveyor of San Augustine Co. March 6th 1906.

CERTIFIED COPY
Attest: 1-16- 20_13
JANICE McDANIEL, County Clerk
Sabine County, Texas
By Jimu Clark , Deputy

CERTIFIED COPY
Attest: _____7-16-_____, 20 13    59
JANICE McDANIEL, County Clerk
Saoine County, Texas
By ____Janie Clark____, Deputy

3rd. TRACT; Being a part of the Sion Smith H. R. Survey about 3 miles South of the Town of Hemphill Beginning at the S.E. Corner of a 50 acre Survey on the E. B. line of John Smith Survey; Thence S 32 deg W 960 vrs. a stake on Sion Smith S. B. line; Thence N 58 W with Sion Smith S.R. line 1033 vrs. becomes S. E. corner; Thence N 33 deg. E with becomes E. B. line 1338 vrs. to corner; Thence S 58 E 191½ vrs. to S. W. corner of said 50 acre Survey at 756 vrs, its S. E. Corner, Thence S 32 W at 378 vrs. the S. W.Corner of another 50 acre Survey, Thence S 58 deg. E 257 varas to the place of beginning, containing 223 acres of land, Also 17 acres of the same survey described as follows, to wit: Beginning at the S. R. Corner of a 50 acre Survey on the W. B. line of another 50 acre survey both of which belongs to J. C. and E. G. Travis, Thence S 32 W at 378 varas S. W. Corner of the last 50 acre survey. Thence S 58 E vrs. S. W. corner of same. Thence N 32 E 278 vrs, to a stake from which a white oak 15 in. brs, N. 58 deg. E 257 varas to the place of beginning containing 17 acres of land.

4th TRACT: A part of the John McAdams H.R. Survey described as follows, Beginning at the original N. E. Corner of the John McAdams Survey where the Colorow Creek unites with Patroon Creek ; Thence down the Patroon Creek S 64 E 50 varas to corner on said Creek the N.W. corner of a tract of 640 acres known as the Smithers tract witness a box elder brs. N 51 E 4 varas a Sycamore tree brs. N 50½ W 7 2/5 varas Thence S 26 deg W with the W, B. line of Smithers tract at 1680 varas Sexton and Milam road at 2110 varas to corner witness a pine brs. S 63½ E 3 1/10 vrs. pine brs. S 6 3/4 W 2 varas, Thence N 64 W 744 varas to corner on the S.E. B. C. line of the Robert Polley 50 acre tract witness a red oak marked P. brs. S 16 deg E 5 varas a pine brs.N 12 deg W 1 vara, Thence N 54 deg E to Robert Polley line 641 varas to corner in the Sexton and Milam road witness a post oak brs. S 37 deg W 5 varas a pine brs. S 67½ W 4 1/5 varas, Thence with said road as follows: 1st. N 35½ W 182 varas 2nd 59½ W 220 varas, 3rd N 23½ W 168 varas to corner on the Colorow Creek just below the bridge said corner is on a high bluff bank witness a white oak brs. S 67 deg W 4 varas a pine N 68 deg E 3 1/5 varas. Thence down the Colorow Creek with its meanders its general course being N 62½ E 1530 varas to the place of beginning containing 260 acres less 130 acres reserved by W. A. Polley for farm now occupied by Henry Evans and said 130 acres reserved described as follows: Beginning at the S. E. corner of said farm on the W. bank of Patroon Creek witness an Elm brs. S 17 3/4 E 1 2/5 v ras a Sweet gum brs. S 55½ E 10 varas a Maple brs. S 28 1/4 E 6 2/5 varas, Thence S 44 E 540 varas to corner a sweet gum brs. N 44 W 1 2/5 varas a sweet gum brs.N 1½ W 1 2/5 varas, Thence S 2 3/4 varas W 220 varas to corner on the Sexton and Milam Road a Post Oak brs. N 12 deg W 4 2/5 varas a pine brs. N 68 deg W 5 2/5 varas, Thence with said road as follows 1st N 45 deg W 100 varas 2nd N 44 W 310 varas Robert Polleys North corner on the said road

CERTIFIED COPY
Attest: _7-16-_____ , 20 13
JANICE McDANIEL, County Clerk
Sabine County, Texas
By _____ , Deputy

N 35½ W 182 varas 2nd N 59½ W 220 varas 3rd N 23½ W 168 varas corner on the Colorow Creek just below the bridge witness a white oak brs. S 67 deg. W 4 varas a pine brs. N 68 deg. E 3 1/5 varas, thence down the Colorow Creek with its meanderings its general course being N 62½ E 1530 varas to the mouth of said Creek, Thence down the said Patroon creek S 41½ E 80 varas to the place of beginning as surveyed by James S Mckayrub Surveyor of San Augustine Co. March 12, 1906.

5th TRACT: Being a part of the J. S. Lane Survey consisting of 199 acres bought from R. A. Thompson att that certain tract of land belonging to R. A. Thompson as heir of Wm A. Thompson known as the J. S. Lane Headright- 99½ acres more or less also a tract of land purchased by R. A. Thompson from G. W. Toms and wife and recorded in SabineCounty, Texas, in the recorders office of said County being a part of the J. S. Lane H. R. consisting of 99½ acres more or less and further reference description and boundaries reference is given to Surveyors office or the County of Sabine and State of Texas where the above described property is situated. To have and to hold the above described premises, together with all and singular the rights and appurtenances thereto in anywise belonging unto the said W. A. Pickering his heirs and assigns forever And I do hereby bind myself my heirs executors and administrators to warrant and forever defend all and singular the said premises unto the said W. A. Pickering his heirs and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof.

But it is expressly agreed and stipulated that the Vendor's line is retained against the above described property premises and improvements until the above described notes and all interest thereon are fully paid according to their face and tenor effect and reading when this deed shall become absolute.

Witness my hand at Sexton this 26th day of March A.D. 1906.

ATTEST:                                          W. A. Polley

D. Pratt

M. C. Pratt

THE STATE OF TEXAS

COUNTY OF SHELBY    BEFORE me M. B. Carter Justice Peace Ex Officio Notary Public in and for Sabine County, Texas, on this day personally appeared W. A. Polley known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this the 26th day of Mch. A.D. 1906.

(L.S.)                          M. B. Carter Justice Peace Ex officio Notary
                                Public in and for Sabine County, Texas.

Attest: _7-16-_____, 20 13  61

JANICE McDANIEL, County Clerk

Sabine County, Texas

By Jamie Clark , Deputy

I hereby certify that the foregoing instrument was filed for record in my office the 28th day of March 1906 at 3 o'clock P.M. and duly recorded the 31st day of March A.D. 1906 at 12 o'clock M.

J. A. Watson Clerk Co. Ct.

By: W. H. Smith, Deputy                    Sabine County, Texas.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WARRANTY DEED

D. T. MEIGS & WIFE

TO                    Filed for record March 30, 1906 at 8 o'clock A.M.

W. S. SMITH

THE STATE OF TEXAS

COUNTY OF SABINE      KNOW ALL MEN BY THESE PRESENTS, That we D. T. Meigs and wife Jemine Meigs of the County of Sabine State of Texas for and in consideration of the Sum of Seventy five dollars to us paid and secured to be paid by W. S. Smith as follows   Cash, have granted, sold and conveyed and by these presents do grant, sell and convey unto the said W. S. Smith of the County of Sabine State of Texas all that certain of land situated in Sabine County, Texas, and it being a part of the Donald McDonald League and more fully described, to-wit: Beginning on the road at Lewis Letneys S. W. Corner, Thence S 80° W 180 vrs to cor. in road, Thence N 26° E 130 vrs. to Lewis Ware Original N. E. Cor. Thence S 80° E 80 vrs. Thence N 50° E 32 vrs. Thence S 10° E to place of beginning containing 2 acres of land. To have and to hold the above described premises together with all and singular the rights and appurtenances thereto in anywise belonging unto the said W. S. Smith heirs and assigns forever, And we do hereby bind ourselves heirs executors and administrators to warrant and forever defend all and singular the said premises unto the said W. S. Smith heirs and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof.

Witness our hands at Brookeland this 22nd day of March A.D. 1906.

D. T. Meigs
                                              her
                              Jemina    X    Meigs
                                              mark

THE STATE OF TEXAS

COUNTY OF SABINE      BEFORE me W. A. Hooks Notary Public in and for Sabine County Texas on this day personally appeared D. T. Meigs well known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 22nd day of March A.D 1906.

    (L.S.)                         W. A. Hooks    Notary Public
                                    in and for Sabine County, Texas.

# Appendix Tab D

CERTIFIED COPY
Attest: 4-2- , 20 13
JANICE McDANIEL, County Clerk
Sabine County, Texas
By _____ Deputy

456

Warrantee Deed.

W. A. Polley To J. O. Payne

Filed for record this The 07th day of Dec. A.D. 1907. at 5. O'clock A.M.

S. E. King County Clerk

The State of Texas. County of Sabine } Know all men by these presents: That I W. A. Polley of the County of Sabine State of Texas for and in consideration of the sum of $4372.00 Four Thousand three hundred two & No/100 Dollars to me paid by J. O. Payne as follows: Cash in hand the receipt hereby acknowledged, have granted Sold and Conveyed, and by these presents do grant, sell and Convey, unto the said J. O. Payne of the County of San Augustine State of Texas, all that certain tract to-wit:- 130 acres of John McAdams in Sabine Co. about one mile S.E. from Sexton, on Milam an old Sexton road, on the west side of the Patroon creek, about 1 mile S.E. from the town of Sexton, and this survey includes W. A. Polley Farm; on a 260 acre survey on the John McAdams Survey:- Beginning at S.E. Cor. of said farm on the on the west bank of Patroon Creek, Witness an elm brs S. 17. ¾ E. 1. ⅗ vrs. a Sweet gum brs S 55. ½ E. 10 vrs, a maple brs S. 28¼ E 6. ⅘ vrs. Thence S. 44 E. 540 vrs to cor. a Sweet gum brs N. 44. W. 1⅖ vrs a Sweet gum brs N 1½ W 1.½ vrs; Thence S 3¾ W. 220 vrs to Cor. in Sexton & Milam road a post oak brs N. 12 W. 4⅗ vr. a pine brs N. 68 W. 5⅗ vrs. Thence with said road as follows. 1st. N. 65 W, 187 vrs. 2nd. N. 44 W. 310 vrs Robert Lolley North Cor. on with said road N 35. ½ W. 182 vrs. 2nd N 59½ W. 220 vrs. 3rd N. 23.½ W. 168 vrs to cor. on the Colorow Creek. just below the witness a white oak brs S. 67 W. 4 vrs, a pine brs N. 68 E. 3.½ vrs. Thence down the creek with its meanders its general course being N. 62.¼ E. 1530 vrs. to Mouth of said creek thence down the Patroon creek S 41.½ E. 80 vrs. to place of beginning, bearing mkd X. Variation 8 East Survey March 12th 1906. by Jim A. McLaurin Surveyor of San Augustine Co. Also a tract of 400 acres of the John Frazer Survey in Sabine Co. ½ mile from Sexton known as the John Polley old place, for full descrip'tion see deeds from J. P. Payne, Heirs to J. O. Payne deed records Sabine Co, Texas, another tract in San Augustine Co. Texas, another tract Containing 45 acres of Richard Hailey in Sabine Co, about 4 miles from Sexton

EXHIBIT 4

DEED Y

CERTIFIED COPY
Attest: _____, 20 13        457
JANICE McDANIEL, County Clerk
Sabine County, Texas
by _____, Deputy

on Sexton & East Hamilton road where Joe Young now lives all under fence; described as following. Beginning at a point on the E.B. line of Richard Hailey Survey, where said line crosses the Martining creek a large Sweet gum mkd x. Thence S. 26 W 100 vrs to cor. a hickory mkd x. Thence S 86 W. 430 vrs to cor. a buck brs S. 59½ W 1 vr. Thence S. 53 W. 700 vrs to cor. a large buck brs S. 35.½ E 2⅘ vrs. Thence N 41.¼ W 504 vrs; to cor. A Post oak brs S. 41.½ E 1⅘ vrs. a pine brs S. 75 W. 4⅘ vrs. Thence N. 30.½ W. 154 vrs to cor on the Martinez creek a white oak brs S. 51 E. 1 vr. Thence down said creek with its meanders. its general course being N. 87 E. 626 vrs to place of beginning. 400 acres also 4.½ acres on Richard Hailey one Young place. Beginning at a point in Hamilton & Sexton road. a hickory brs S. 54 W. 2 vs Thence N 36½ W. 120 vrs. to cor. in open field Thence N.57 E. 160 vrs to East side of the Spring branch just below. the Spring the Spring a Sweet Gum brs S 45.½ W. 1 vr. an iron wood brs N. 44.½ E 13 vrs. Thence S 2 E. 174 vrs to cor. in the Hamilton & Sexton road a pine brs S. 29 E. 7⅘ vrs. Thence S 73 W. 154 vrs. to the place of beginning. bearing mkd x. Variations 8 E. - To Have and to Hold. the above described premises. together with all and singular the rights and Appurtenances thereto in any wise belonging. unto the said J.O. Payne his heirs and assigns forever. And I do hereby bind my heirs, executors and administrator to warrant and forever defend, all and singular the said premises unto the said J.O. Payne heirs and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof by through or under me and no further. Witness my hand this at this 15th day of Dec, A.D. 1907.          W.A.Polley

The State of Texas. Before me W.J. Garrett County of San Augustine Clerk County Court in and for San Augustine County, Texas on this day personally appeared W.A.Polley known to me to be

DEED Y

CERTIFIED COPY
Attest: _____4-1_____ , 20 13
JANICE McDANIEL, County Clerk
Sabine County, Texas
By _____, Deputy

458

the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and considerations therein expressed.

Given under my hand and Seal of office this 15th day of Dec. A.D. 1907.

[L.S.]

W. J. Garrett, Clerk
County Court. San Augustine
Co; Texas.

I Hereby certify that the foregoing instrument was Filed for record in my office on the 17th day of December 1907. At 8 O Clock A.M. and was duly placed of record on the 18th day of Dec; A.D. 1907, at 4 O Clock P.M.    L. E. King
County Clerk Sabine Co. Texas.

Warrantee   The State of Texas ) Know all men by these presents.
Deed        County of Sabine ) That we. W.P. Edgar of the county of
W.P. Edgar  Hall. State of Texas. and B. McDonald and T.R. Smith
T.R.Smith   of the County of Sabine State of Texas for and in con-
B.McDonald  sideration of the Sum of Six Hundred Dollars to us
To.         paid by V. H. Vickers, and the receipt of which is
V. H. Vickers hereby acknowledged as follows. Have granted,
Filed for   Sold and Conveyed. and by these presents do
record      grant, sell and Convey. unto the said V. H. Vickers
this 17th   of the County of Sabine State of Texas all that cer-
day of Dec. tain tract or parcel of land described as follows.
A.D. 1907.  Beginning at a Sycamore tree standing on the
at 10 oclock West Bank of the Sabine river about 300 yards
A.M.        above the mouth of Housand Bayou Thence
L.E. King   down said river to the mouth of said Bayou
County      Thence up said Bayou with its meanders about
Clerk.      one mile to a Willow tree marked N. A. L. stand-
            ing on the north Bank of said Bayou. Thence in
            a Northerly direction to the original league
            line at a red oak marked N. A. L also
            a Lightwood stake for corner. Thence East on
            said league line to the corner of said league,
            a Sweet gum and dead oak stump marked
            C. L. B. also a Light wood stake for corner.

# Appendix Tab E

**FILED**
AT_____ O'CLOCK_____M

APR 16 2015

TANYA WALKER, Clerk District Court
Sabine County, Texas

By_____

| | | |
|---|---|---|
| CONSOLIDATED PROPERTY INTERESTS, LLC | § § § | |
| V. | § | CAUSE NO. 12,827 |
| JERRY PAYNE AND PENNY PAYNE | § § § | |

## PLAINTIFF'S REQUEST FOR FINDINGS OF FACT AND CONCLUSIONS OF LAW IN CONNECTION WITH THE COURT'S MARCH 13, 2015 JUDGMENT

COMES NOW, Plaintiff, Consolidated Property Interests, LLC, and asks the court to file findings of fact and conclusions of law.

### I.

The court signed a Judgment on March 13, 2015.

### II.

Plaintiff asks the court to file findings of fact and conclusions of law, in connection with the March 13 judgment, as required by Texas Rule of Civil Procedure 297.

### III.

The requested findings and conclusions are due April 21, 2015, which is twenty days after this request.

### IV.

This request is timely as it is filed within twenty days of the date the court signed the applicable judgment.

Respectfully submitted,

**BRENT L. WATKINS**
State Bar No. 24033312
**SKELTON SLUSHER BARNHILL
WATKINS WELLS, PLLC**
1616 S. Chestnut
Lufkin, TX 75902-1728
Telephone: (936) 632-2300
Facsimile:   (936) 632-6545

**RAMEY & FLOCK, P.C.**
100 E. Ferguson, Suite 500
Tyler, Texas  75702
903-597-3301
903-597-2413 – Fax

**GREG SMITH**
State Bar No. 18600600
gsmith@rameyflock.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has

forwarded to the following counsel of record by facsimile on this the 1st day of April, 2015:

**Via Fax 409-384-3017**
Mr. John H. Seale
SEALE STOVER & BISBEY
P. O. Box 480
Jasper, TX  75951

GREG SMITH

# Appendix Tab F



# TANYA WALKER, DISTRICT CLERK

## COUNTY OF SABINE

### FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| TO: *Hope Sorensen* | FROM: *Lisa Petre* |
| COMPANY: | DATE: 4-17-2015 |
| FAX NUMBER: 903-597-2413 | TOTAL NO. OF PAGES, INCLUDING COVER: 3 |
| PHONE NUMBER: | SENDER'S REFERENCE NUMBER: |
| RE: | YOUR REFERENCE NUMBER: |

☐ URGENT    ☐ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

NOTES/COMMENTS:

FILED

AT ___1:15___ O'CLOCK ___P___ M

APR 17 2015

TANYA WALKER, Clerk District Court
Sabine County, Texas

By_____



**UNITED STATES POSTAL SERVICE**

Certificate Of Mailing

From: GREG SMITH
RAMEY & FLOCK
100 E. FERGUSON ST. STE 500
TYLER TX 75702

To: TANYA WALKER
SABINE COUNTY DISTRICT CLERK
P.O. Box 850
HEMPHILL TX 75948

PS Form 3817, April 2007 PSN 7530-02-000-9065

US POSTAGE
FIRST-CLASS
0028000818S479
75702

# RAMEY FLOCK

A PROFESSIONAL CORPORATION

Attorneys and Counselors at Law

Greg Smith
Attorney at Law
Direct Dial: 903-510-5222
Email: gsmith@rameyflock.com

April 1, 2015

**FILED**
AT 1:15 O'CLOCK P M
APR 17 2015
TANYA WALKER, Clerk District Court
Sabine County, Texas
By_____

Tanya Walker
Sabine County District Clerk
P. O. Box 850
Hemphill, TX 75948

Re: Cause No. 12,827; *Consolidated Property Interests, LLC v. Jerry Payne and Penny Payne*; In the District Court of Sabine County, Texas

Dear Ms. Walker:

Enclosed for filing in the above-referenced case are an original and one copy of the following:

1. Plaintiff's Notice of Appearance of Additional Counsel; and

2. Plaintiff's Request for Findings of Fact and Conclusions of Law in Connection with the Court's March 13, 2015 Judgment.

Please acknowledge receipt of same by placing your file-stamp on the extra copy of the pleading and return a conformed copy of this document to me in the enclosed postage-paid envelope.

Thank you for your assistance in these regards.

Very truly yours,

GREG SMITH

GS/hhs
Enclosures

cc: **Via Fax**
Mr. John H. Seale
Seale Stover & Bisbey

**Via Fax**
Mr. Brent L. Watkins
Skelton Slusher Barnhill Watkins Wells

100 E. Ferguson, Ste. 500 · Tyler, Texas 75702 · Phone: 903.597.3301 · Fax: 903.597.2413 · www.rameyflock.com